Daniel J. Rohlf
OSB # 99006
rohlf@lclark.edu
Pacific Environmental Advocacy Center
10015 S.W. Terwilliger Blvd.
Portland, OR 97219-7768
Telephone: (503) 768-6707
Fax: (503) 768-6642

Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER | Case No.: |
| Plaintiffs, | PLAINTIFF'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, U.S. ARMY CORPS OF ENGINEERS | |
| Defendants. | |

_____

## INTRODUCTION

1.      After nearly being extirpated by a variety of human-caused impacts, increasing numbers of steelhead, cutthroat trout, and even coho salmon are returning to Tryon Creek, one of the few remaining relatively intact urban watersheds in the Portland, Oregon metropolitan area.  The local community has invested considerable effort to restore Tryon Creek and make its watershed conditions suitable for supporting anadromous fish.  Now, actions authorized by the United States Army Corps of Engineers ("Army Corps") and the United States National Marine Fisheries Service ("NMFS") threaten this notable achievement.  These two federal agencies have approved construction of a large boat dock on the Willamette River, less than a half-mile away from the mouth of Tryon Creek, without fully and adequately considering the detrimental effect the dock poses to threatened and endangered species, Tryon Creek restoration efforts, and to the Willamette River watershed as a whole.

2.      Numerous threatened anadromous fish species both pass through and use habitat surrounding Willamette River mile 20.4, the site of the proposed Lake Oswego dock, including Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, Lower Columbia River Coho salmon, Columbia River chum salmon, Lower Columbia River steelhead, and Upper Willamette River steelhead.

3.      This case is a civil action for declaratory and injunctive relief.  Defendant NMFS has violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, by issuing the flawed SLOPES III Biological Opinion ("BiOp"), applying it to the Lake Oswego dock, and failing to consider whether the dock will cause destruction or adverse modification of critical habitat.  Defendant Army Corps has violated

NEPA, the APA, and the Rivers and Harbors Act ("RHA"), 33 U.S.C. §§ 401 *et seq.*, by issuing a Section 10 RHA permit to build the Lake Oswego dock and making a finding of no significant impact under NEPA, though it will likely have significant adverse environmental impacts.

4.     Plaintiff Northwest Environmental Defense Center requests that the Court declare the SLOPES III BiOp and its application to the Lake Oswego dock project violate the ESA, NEPA, RHA, and APA; hold unlawful and set aside the SLOPES III BiOp and the dock's RHA Section 10 Letter of Permission; order NMFS to rescind the SLOPES III BiOp; order the Army Corps to formally consult NMFS under Section 7 of the ESA to issue a valid BiOp for the Lake Oswego dock project; and order the Army Corps to undertake a standard RHA Section 10 permit process, rather than an expedited Letter of Permission process.  Plaintiffs also seek an award of attorney fees and expenses.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 & 1346 because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA, NEPA, the APA, and the RHA.  An actual, justiciable controversy exists between Plaintiffs and Defendants.  The requested relief is proper under 28 U.S.C. § 2202 and 5 U.S.C. §§ 705 & 706.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).  Defendant NMFS has its headquarters for the Northwest Region in Seattle, WA.  Defendant Army Corps has its headquarters for the Portland District and the Northwest Region in Portland, OR.  Plaintiff Northwest Environmental Defense Center has members who reside within this District and who have been injured by the Defendants actions and activities complained of herein.  A substantial part of the events and omissions giving rise to the Plaintiffs' claims occurred in Oregon.

## **PARTIES**

7.       Plaintiff Northwest Environmental Defense Center ("NEDC") is a nonprofit organization, with its principal place of business in Portland, OR.  NEDC is comprised of citizens, attorneys, law students, and scientists.  NEDC's mission is to  protect the environment and natural resources of the Pacific Northwest, by providing legal support to individuals and grassroots organizations with environmental concerns, and engaging in litigation independently and in conjunction with other environmental groups.  NEDC's members live, recreate, and study in and around Lake Oswego, the Willamette and Columbia Rivers, and Tryon Creek, and derive recreational, inspirational, scientific, and aesthetic benefit from their activities along and on these rivers.  NEDC actively participates in procedures and decisions by federal agencies concerning the management and protection of listed anadromous fish species in the Willamette River system, and NEDC's members intend to continue to use and enjoy these rivers and Lake Oswego's Foothills Park, where the proposed dock has been sited.

8.       The aesthetic, recreational, scientific, and spiritual interests of NEDC's members have been adversely affected and will be irreparably injured if NMFS and the Army Corps continue to act and fail to act as alleged herein.  Threats to listed anadromous fish species are a detriment to achieving NEDC's goals of protection and restoration, and this group's members and staff continue to be injured by NMFS' and the Army Corps' actions.  NMFS' failure to comply with the ESA, NEPA, APA, and other federal laws, and the Army Corps' failure to comply with the RHA, ESA, NEPA, and other federal laws cause actual, concrete injuries.  The relief sought would redress these injuries.

9.      NEDC has exhausted any available administrative remedies.  Reviewable final agency action exists and is subject to this Court's review under 5. U.S.C. §§ 702, 704, and 706.

10.     Defendant NMFS is an agency of the U.S. Department of Commerce.  It and its officers are responsible for the lawful administration of the ESA with respect to anadromous fish, such as those at issue in this case.  NMFS issued the SLOPES III programmatic BiOp challenged in this action.

11.     Defendant Army Corps is an agency of the U.S. Department of Defense, and is responsible for the lawful administration of the RHA.  The Army Corps issued the RHA Letter of Permission challenged in this action.

## SUMMARY OF FACTS AND GENERAL ALLEGATIONS

**The Columbia and Willamette Rivers**

12.     The Columbia and Willamette River systems provide critical habitat for fish species, including several steelhead and salmon species, listed as threatened under the ESA. Steelhead and salmon are anadromous fish. They are born and rear in fresh water tributaries of the Columbia River, including the Willamette River and Tryon Creek, migrate downstream through the Columbia River system to the Pacific Ocean where they grow and live as adults, and return to their natal streams and lakes to spawn and die. The Columbia River, its tributaries, and estuary historically provided habitat for chinook, sockeye, chum, and coho salmon, as well as steelhead. A century ago, between 10 and 16 million salmon returned to the Columbia Basin each year. As of 1991, 67 stocks of Columbia River salmonids were extinct and 76 stocks were at risk of extinction.[1]

---

[1] For an imperiled species to enjoy the ESA's protections, it must first be placed on the Act's "threatened" or "endangered" species lists. 16 U.S.C. § 1533(c). A "species" that may be listed for protection under the ESA includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when

13.     NMFS established the Willamette/Lower Columbia ESA salmon recovery domain in 2000, to promote recovery of the region's threatened salmon and steelhead species. The domain includes populations of Upper Willamette River chinook salmon and Upper Willamette River steelhead, as well as Lower Columbia River coho and steelhead.

14.     Several salmon and steelhead species found in the dock project area are listed as threatened under the ESA.  NMFS listed Lower Columbia River chinook,[2] Upper Willamette River chinook,[3] Columbia River chum,[4] Lower Columbia River steelhead[5] and Upper Willamette River steelhead[6] in 1999.  In 2005, NMFS listed Lower Columbia River coho salmon as threatened[7] and designated the dock project area as critical habitat for Lower Columbia River chinook, Lower Columbia River steelhead, Upper Willamette River chinook and Upper Willamette River steelhead.[8]

15.     The Willamette River at the dock site provides critical spawning and rearing habitat for the Lower Columbia River chinook and Lower Columbia River steelhead ESUs, and critical migration habitat for the Upper Willamette River chinook and Upper Willamette River steelhead ESUs.  Tryon Creek provides designated critical habitat for Lower Columbia River steelhead spawning and rearing.  Salmon require cool, clean water, stream bank vegetation, and

---

mature." 16 U.S.C. § 1532(16). When deciding whether to list populations of Pacific salmon for protection as a "distinct population segment" under this definition, NMFS employs the concept of "evolutionarily significant unit" ("ESU"). A population of Pacific salmon is an ESU if it is "(1) . . . reproductively isolated from other population units of the same species, and (2) . . . an important component in the evolutionary legacy of the biological species." 64 Fed. Reg. 14,308 14,310 (Mar. 24, 1999).

[2] 64 Fed. Reg. 14,308 (Mar. 24, 1999).

[3] *Id.*

[4] 64 Fed. Reg. 14,508 (Mar. 25, 1999).

[5] 63 Fed. Reg. 13,347 (Mar. 19, 1998).

[6] 64 Fed. Reg. 14,517 (Mar. 25, 1999).

[7] 70 Fed. Reg. 37,160 (Jun. 28, 2005).

[8] 70 Fed. Reg. 52,630 (Sept. 2, 2005).

specific flow depth and velocity for migration and additionally need clean gravel for spawning

and rearing.  Restoration efforts in the Willamette River and Tryon Creek have improved these

habitat characteristics for threatened salmonids.

**Tryon Creek**

16.     Tryon Creek has been the focus of considerable restoration efforts, which have

been remarkably successful.  Recent surveys by the U.S. Fish & Wildlife Service have confirmed

the presence of juvenile steelhead, cutthroat trout, and coho salmon.

**SLOPES III Programmatic Biological Opinion**

17.     NMFS  has issued a series of programmatic BiOps to evaluate, approve, and issue

incidental take statements[9] under the ESA for 15 species of salmon, including Chinook salmon,

and steelhead.  These BiOps consider the impact of NMFS' Standard Local Operating

Procedures ("SLOPES") and are therefore referred to as the SLOPES BiOps.  The SLOPES

BiOps cover a variety of "routine" water-related projects that must be reviewed and approved by

the Army Corps throughout the State of Oregon and the north shore of the Columbia River.

18.     The SLOPES BiOps operate similarly to categorical exclusions under NEPA.

NMFS uses the SLOPES BiOps to consider and evaluate the impacts to endangered and

threatened fish species from certain types of "routine" projects under the assumption that certain

specified "standard operating procedures" are followed for each type of project.  Based on this

---

[9] The ESA defines "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  "Incidental take" refers to "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."  50 C.F.R. § 402.02.  When the consulting agency's (NMFS or the U.S. Fish & Wildlife Service) BiOp concludes an action will not violate ESA § 7(a)(2), the service must issue an incidental take statement along with the BiOp, specifying the impact of such incidental taking on the species and measures the applicant must take to minimize incidental take.  If the action exceeds the statement's specified amount of incidental take, the Federal action agency must immediately reinitiate consultation.  50 C.F.R. § 402.14(i).

evaluation and the imposition of these standard operating procedures, NMFS determined that the Army Corps' authorization of these projects, although likely to take some members of endangered and threatened species, would not jeopardize the continued existence of those species.

19.     On November 30, 2004, NMFS issued "SLOPES III," the third SLOPES BiOp.[10] SLOPES III evaluates projects ranging from the installation of utility lines across a river to road construction near rivers and streams.  The evaluated projects specifically include the construction of docks and similar in-river structures.  SLOPES III acknowledges that in-river structures such as boat docks harm, and result in take of, threatened and endangered juvenile salmon in a number of ways, including providing preferred habitat for non-native predatory species that feed on the juvenile fish.  SLOPES III BiOp at 86.  These impacts result both from construction of authorized projects themselves and the habitat loss and alteration associated with these structures.  However, though SLOPES III acknowledges take occurs from habitat impacts, the BiOp only quantifies take from the construction activities, and does not expressly acknowledge that total take will exceed its construction take estimate.  Moreover, the BiOp's reasonable and prudent measures to minimize take focus almost exclusively on construction activities, and not on the resulting structures or their ongoing habitat impacts.

20.     In its analysis of construction impacts, SLOPES III estimates that take resulting from construction activities will not exceed 9,000 juvenile individuals per year, and that authorized projects will not take any listed adult fish.  SLOPES III BiOp at 103.  This number does not include any estimate of, or limit on, take resulting from these projects' ongoing habitat

---

[10]  NAT'L MARINE FISHERIES SERV. NORTHWEST REGION, NAT'L OCEANIC & ATMOSPHERIC ADMIN. OF THE U.S. DEP'T OF COMMERCE, REVISED STANDARD LOCAL OPERATING PROCEDURES FOR ENDANGERED SPECIES (SLOPES III) TO ADMINISTER CERTAIN ACTIVITIES AUTHORIZED OR CARRIED OUT BY THE DEPARTMENT OF THE ARMY IN THE STATE OF OREGON AND ON THE NORTH SHORE OF THE COLUMBIA RIVER (Nov. 30, 2004).

destruction.  The estimate that this take will not exceed 9,000 juveniles and zero adult salmon is also based on the assumption that none of the authorized projects will involve more than 200 feet of in-water alteration.

21.     SLOPES III does not attempt to quantify take attributable to habitat loss and alteration. SLOPES III also fails to impose adequate reasonable and prudent measures for minimizing habitat-related incidental take; the measures focus instead on minimizing take from construction.  The BiOp's only proxy for such a limit on take resulting from habitat loss and alteration is a limit on the number of projects that the Army Corps can authorize with SLOPES III per year.  The SLOPES III BiOp's total overall incidental take authorization never underwent any NEPA analysis.

**Lake Oswego Dock**

22.     On November 20, 2007, the Army Corps issued a Letter of Permission to the City of Lake Oswego, Department of Parks and Recreation, authorizing the City to construct a boat dock on the Willamette River at River Mile 20.4, less than one half mile from the mouth of Tryon Creek.  The Letter of Permission authorizes the construction under Section 10 of the RHA.  To comply with the ESA, the Army Corps initially sought formal consultation with NMFS, and requested a BiOp for the project.  However, rather than prepare a BiOp, NMFS granted a variance to ostensibly conform the dock project to SLOPES III's specifications, and authorized the Army Corps to rely on that programmatic BiOp to satisfy both agencies' ESA obligations.  The Army Corps then proceeded to issue the Letter of Permission under the SLOPES III BiOp.  It issued the Letter of Permission over objections under the RHA, NEPA, and the ESA by the Tryon Creek Watershed Council, and objections under the ESA by numerous affected citizens.

23.     The RHA Section 10 Letter of Permission authorizes a substantial dock; current plans call for the construction of a concrete dock 293 feet long and 8 feet wide.  This design required a variance from SLOPES III, as the BiOp is meant to apply only to docks up to 6 feet wide.  The dock will not have any sewage disposal facility, though it will allow about 13 non-trailerable recreational boats to dock overnight.  The construction work will degrade habitat and water quality, but the project's adverse impacts will not cease when the dock is complete.  Once constructed, the Lake Oswego dock will provide shelter for predatory fish, increase sediment pollution, and cause other direct and indirect adverse impacts to threatened species' habitat and water quality.  As a result, both the construction of the dock and its existence and use are reasonably certain to cause death and injury to listed salmon and steelhead.

## CLAIMS FOR RELIEF

**CLAIM 1:**     **The National Marine Fisheries Service violated the ESA and the APA by identifying the SLOPES III BiOp as its advice to the Army Corps as to whether the Army Corps' approval of the Lake Oswego dock project satisfies the agency's obligation to insure against destruction or adverse modification of designated critical habitat of listed salmonids.**

24.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

25.     As part of its statutory responsibilities under section 7 of the ESA, NMFS is tasked with providing advice to federal agencies as to whether their proposed action are likely to destroy or adversely modify designated critical habitat. When a federal agency initiates formal consultation with NMFS regarding an action likely to adversely affect listed anadromous fish species or their critical habitat, NMFS advises the agency whether its proposed action is likely to violate section 7 by issuing a BiOp. *See*  16 U.S.C. § 1536(b)(3)(A). A BiOp must provide a detailed analysis as to a proposed federal action's impacts on critical habitat and whether those impacts are likely to constitute destruction or adverse modification of that habitat. *Id*.  BiOps

must take all impacts into account to satisfy this specificity requirement.  However, since NMFS

designated critical habitat for Lower Columbia River chinook salmon, Lower Columbia River

steelhead, Upper Willamette River chinook salmon, and Upper Willamette River steelhead a year

*after* it issued the SLOPES III BiOp,[11] there is no way that this BiOp could provide the Corps

with advice as to whether approval of the Lake Oswego dock would result in destruction or

adverse modification of newly-designated critical habitat for these species, which includes the

site of the dock and the nearby Tryon Creek watershed. By failing to consider adverse impacts to

critical habitat designated in 2005, NMFS violated its obligations under the ESA when it

informed the Corps that the SLOPES III BiOp provided NMFS' section 7 advice to the Corps for

the Lake Oswego dock.

26.    The ESA requires section 7 consultation for projects that will likely result in an

adverse impact on an Evolutionarily Significant Unit ("ESU"), which NMFS treats as distinct

species, or the designated critical habitat for a listed species or ESU.  *See* 64 Fed. Reg. 14,308.

(Mar. 24, 1999).

27.    On July 9, 2007, the Army Corps initiated formal ESA consultation with NMFS

for the Lake Oswego dock project, and requested a site-specific BiOp for that project.  On

August 27, 2007, the Army Corps sent a Biological Assessment ("BA") to NMFS, reaffirming its

request that NMFS prepare a BiOp.  The BA found the dock would likely have adverse impacts

on Lower Columbia River steelhead, Upper Willamette River steelhead, Lower Columbia River

Chinook salmon, and Upper Willamette River Chinook salmon. The BA also found the dock

project "may affect essential features of aquatic and riparian areas previously designated as

critical habitat for listed salmonids."  If a BA concludes that a project "may affect listed species

or critical habitat," section 7 consultation is required.  50 C.F.R. § 402.14.

---

[11] 70 Fed. Reg. 52,630 (Sept. 2, 2005).

28.    On information and belief, NMFS communicated to the Army Corps that the SLOPES III BiOp was adequate to assess the impacts of the dock project on listed salmonids and their habitat and constituted NMFS' advice to the Corps pursuant to section 7. In NMFS view, therefore, further formal consultation regarding the dock was unnecessary. The Army Corps subsequently abandoned its endeavor to  consult separately with NMFS on the dock project, and instead requested authorization from NMFS to rely on SLOPES III for the Lake Oswego dock on November 1, 2007.

29.    Rather than prepare the BiOp initially sought by the Army Corps, NMFS granted a variance from the requirements of the SLOPES III BiOp on August 2, 2007, thus permitting the Army Corps to rely on the SLOPES III BiOp for the Lake Oswego dock project.  The variance was required because the dock will be an over water structure more than six feet wide; SLOPES III is meant to apply only to over water structures less than six feet wide, because increases in shade areas from structures with large surface areas create preferred habitat for salmonid predators.

30.    In 2005, NMFS designated the Lower Willamette/Columbia River Corridor as critical habitat for the threatened Lower Columbia River chinook salmon, Lower Columbia River steelhead, Upper Willamette River chinook salmon, and Upper Willamette River steelhead ESUs.  70 Fed. Reg. 52,630 (Sept. 2, 2005). The critical habitat designation, and the corresponding formal consultation requirement, went into effect on January 2, 2006.  *Id*.  This corridor of critical habitat includes Willamette River mile 20.4, the site of Lake Oswego's proposed dock.  *Id*.

31.    NMFS issued the SLOPES III BiOp in 2004, before designating the Willamette River critical habitat.  Thus, the SLOPES III BiOp does not consider adverse impacts on this

critical habitat from projects it authorizes that postdate designation of critical habitat for Lower Columbia River chinook salmon, Lower Columbia River steelhead, Upper Willamette River chinook salmon, and Upper Willamette River steelhead, including the Lake Oswego dock.  The BiOp only took into account critical habitat designated for "[Snake River] spring/summer-run Chinook salmon, [Snake River] fall-run Chinook salmon, [Southern Oregon/Northern California] Coho salmon, or [Snake River] sockeye salmon." SLOPES III BiOp at 2.

32.    Despite these designations, NMFS advised the Army Corps that coverage under the SLOPES III BiOp's incidental take statement authorized the Lake Oswego dock project's incidental take, again indicating that the SLOPES III BiOp constituted NMFS' section 7 analysis and advice to the Corps regarding the dock.

33.    Because the SLOPES III BiOp fails to analyze and consider all proposed actions' adverse impacts on designated critical habitat , NMFS violates the ESA each time it approves use of the SLOPES III BiOp for actions that may impact critical habitat designated after the SLOPES III BiOp's issuance on November 30, 2004.

34.    For the above reasons, NMFS' affirmative authorization to the Army Corps to rely on the SLOPES III BiOp for compliance with the ESA, despite unexamined impacts on designated critical habitat, violated the ESA and was arbitrary, capricious, and an abuse of discretion, and actionable pursuant to 5 U.S.C. § 706(2)(A).

**Claim 2:    NMFS' SLOPES III BiOp violates the ESA because there is no rational basis for its conclusion that the broad array of actions it purports to analyze, including the Corps' proposal to authorize the Lake Oswego dock, do not jeopardize the continued existence of listed salmon and steelhead.**

35.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

36.    The ESA mandates federal agencies must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of

any endangered species or threatened species or result in the destruction or adverse modification

of critical habitat." 16 U.S.C. § 1536(a)(2). Whenever a federal action may affect a species

listed under the ESA as threatened or endangered, the lead federal "action" agency must consult

with the either the U.S. Fish & Wildlife Service or NMFS, depending on the species involved.

As part of this formal Section 7 consultation, in cases where the proposed agency action is likely

to adversely affect threatened or endangered species, the consulting agency prepares a BiOp to

advise the agency proposing the action as to whether the proposed action jeopardizes the

continued existence of listed species or destroys or adversely  modifies designated critical

habitat. 16 U.S.C. § 1536(b).

38.     To make a determination as to whether a proposed agency action jeopardizes the

continued existence of listed species, the consulting agency – NMFS, in the case of anadromous

species like salmon and steelhead – evaluates "the current status of listed species or critical

habitat," the "effects of the action," and "cumulative effects." 50 C.F.R. § 402.14(g)(2)-(3).

"Effects of the action" include both direct and indirect effects "that will be added to the

environmental baseline." 50 C.F.R. § 402.02. The environmental baseline, in turn, includes "the

past and present impacts of all Federal, State or private actions and other human activities in the

action area" and "the anticipated impacts of all proposed Federal projects in the action area that

have already undergone formal or early section 7 consultation." *Id*. The issuance of a BiOp is a

final agency action, and therefore subject to judicial review.

38.     NMFS violated the ESA by concluding that the broad and indeterminate array of

federal actions and federally authorized purportedly analyzed in the SLOPES III BiOp, including

the Corps' authorization of the Lake Oswego dock, are not likely to jeopardize listed salmon and

steelhead. This biological opinion does not – and indeed *cannot* – identify and consider the

effects of the actions purportedly analyzed by the document. This is true for several reasons. NMFS failed to quantify the total incidental take of listed salmonids likely to result from the projects purportedly authorized by the SLOPES III BiOp, and failed to provide any rationale surrogate measure of incidental take if quantification of this incidental take is not possible. NMFS cannot rule out the risk of jeopardy to listed species as a result of an individual project authorized by the SLOPES III BiOp, without developing a reasonable estimate of the number of listed salmon and steelhead likely to be incidentally killed or injured by that project; similarly, NMFS cannot reasonably assess the likelihood of jeopardy to listed salmonids without developing a rational estimate of the number of protected fish likely to be killed or injured by the additive incidental take of all authorized projects.  In this case, the SLOPES III BiOp does not provide even a rough estimate of the number of salmon and steelhead likely to be killed or injured during construction of the Lake Oswego dock or due to the existence and use of the dock over time, so there is no rational basis for NMFS' conclusion that the dock is not likely to jeopardize the continued existence of listed salmonids.  More generally, the Slopes III BiOp provides no estimate of the overall number of listed fish likely to be killed or injured by the existence and operation of the myriad facilities it purports to assess.  Even assuming for the sake of argument that the number of fish likely to be incidentally taken by the Lake Oswego dock itself would not jeopardize listed salmon or steelhead, there is no rational basis in the SLOPES III BiOp for its conclusion that the total number of protected fish likely to be incidentally taken by all projects covered by the BiOp is not likely to jeopardize listed salmon and steelhead.

39.    The SLOPES III BiOp merely establishes a limit on the maximum number of projects the Army Corps can authorize per year, without accounting for the locations of possible projects.  Impacts on listed species obviously will vary greatly depending on the number and

location of projects that affect these species and their habitat.  NMFS' lack of knowledge of the number or location of projects it purportedly analyzes in the SLOPES III BiOp makes it impossible for the agency to assess the total additive adverse impacts of the agency actions nominally considered in the BiOp.  Assessing these additive impacts on listed salmonids is particularly important because, as SLOPES III acknowledges, "the indirect injury or death of individuals for the life of [each] project is more deleterious than the direct loss of a certain number of individuals."  SLOPES III BiOp at 102.  The approach authorized by SLOPES III makes it impossible to assess the extent of these projects' individual or additive impacts on listed species.

40.    The Lake Oswego dock, purportedly considered by NMFS in its SLOPES III "no jeopardy" BiOp, is likely to have significant adverse impacts on listed species of salmon and steelhead, and is only one of many similar projects that have gone forward pursuant to the SLOPES III BiOp that have such effects. The dock will provide attractive habitat for predators in the Willamette River, in the immediate vicinity of the mouth of Tryon Creek.  In fact, the dock violates two of the three strategies recommended by NMFS to minimize predator attraction,[12] which is particularly troubling considering NMFS itself has recognized that such developments "have increased predation on juvenile salmon by creating ideal habitats for predators and nonnative species."[13]   The dock will also cause more habitat modification than projects

---

[12] Recommended strategies include: installing docks over 50 feet from shore, installing docks where low currents exceed 0.7 feet per second, and providing grating within the dock surface. Plans for the Lake Oswego dock only adhere to the last of these recommendations.

[13] NAT'L MARINE FISHERIES SERV. PROTECTED RES. DIVISION, NAT'L OCEANIC & ATMOSPHERIC ADMIN. OF THE U.S. DEP'T OF COMMERCE, FACTORS CONTRIBUTING TO THE DECLINE OF CHINOOK SALMON: AN ADDENDUM TO THE 1996 WEST COAST STEELHEAD FACTORS FOR DECLINE REPORT, 25 (June 1998).  [Hereinafter Factors Contributing to Decline].  *See also* NAT'L MARINE FISHERIES SERV., NAT'L OCEANIC & ATMOSPHERIC ADMIN. OF THE U.S. DEP'T OF

SLOPES III is intended to authorize; the BiOp assumes authorized projects will involve less than 200 feet of in-water construction. SLOPES III BiOp at 102. The Lake Oswego dock will be 293 feet long. With increased predation levels due to habitat modification and introductions of nonnative species and, chinook salmon populations have been declining, "particularly in areas where habitat alterations have tipped the predator/prey balance in favor of predators." *Factors Contributing to Decline* at 6-7.

41.     Listed salmon and steelhead will also be adversely impacted by decreased water quality resulting from construction activities, the addition of large boat traffic close to shore, propeller wash, and likely sewage dumping. NMFS characterizes sedimentation from land use activities like in-water dock construction as "a primary cause of habitat degradation in the range of West Coast Chinook salmon." *Id.* at 6. 80-90% of historic riparian habitat for chinook has been eliminated, *id.* at 9; the additional degradation from the Lake Oswego dock, and all other projects authorized by SLOPES III, threatens to place these listed salmonids in jeopardy.

42.      The Lake Oswego dock threatens listed salmonids with jeopardy and thus NMFS' "no jeopardy" determination for the SLOPES III BiOp violates the ESA, and is arbitrary, capricious, and an abuse of discretion, and actionable pursuant to 5 U.S.C. § 706(2)(A).

**CLAIM 3:     NMFS' SLOPES III BiOp violates the ESA by failing to impose a numerical limit on the protected fish that can be taken as a result of habitat loss.**

43.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

44.     The ESA requires Incidental Take Statements to specify the "impact" of the incidental taking on a listed species. 16 U.S.C. § 1536(b)(4)(i). "Where possible, the impact

COMMERCE, FACTORS FOR DECLINE: A SUPPLEMENT TO THE NOTICE OF DETERMINATION FOR WEST COAST STEELHEAD UNDER THE ENDANGERED SPECIES ACT, 36 (1996).

should be specified in terms of a numerical limitation on the Federal agency or permittee or licensee." H.R.Rep. No. 97-567, at 27 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2827. This impact encompasses not only the estimated take from construction itself – which the BiOp estimates at 9,000 juveniles – but also from ongoing impacts related to habitat degradation and predators. SLOPES III does not limit take from habitat loss, but rather only from construction.

45.    The numerical limit imposed by NMFS must have some relationship to the number of species members the project is expected to affect, unless the agency specifically explains why imposing such a limit would be "impracticable." Quantifying take in terms of habitat loss is not an adequate substitute, absent a showing of impracticability.

46.    SLOPES III acknowledges that authorized projects will result in habitat destruction and conditions favorable to salmonid predators, but does not attempt to quantify the resulting take of threatened and endangered species. Rather, the BiOp estimates take from construction only, and limits the additional take from habitat loss only through "a limit on the number of projects each year that my be authorized, or a limit on the total number of river miles that may be altered by those projects, whichever comes first." SLOPES III BiOp at 102.

47.    Using a limit on total projects and habitat loss as a proxy for a limit on total take of listed species from projects authorized under SLOPES III, without demonstrating that establishing a numeric limit on take resulting from habitat loss is impracticable and without explaining the relationship between the total number of projects and habitat loss proxy and the level of death or injury to listed species, violates the ESA and is arbitrary, capricious, and an abuse of discretion, and actionable pursuant to 5 U.S.C. § 706(2)(A).

**CLAIM 4:    The Army Corps of Engineers violated the Rivers and Harbors Act and the Administrative Procedure Act by using a Letter of Permission, rather than a standard Section 10 permit, to approve the Lake Oswego dock.**

48.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

49.     The Army Corps issued a Letter of Permission approving construction of the Lake Oswego dock on November 20, 2007.  Unlike standard RHA Section 10 permits, Letters of Permission do not require general public notice and comment before the Army Corps authorizes a project.  33 C.F.R. § 325.5(b).

50.     The Rivers and Harbors Act allows the Army Corps to issue a Letter of Permission, rather than a regular Section 10 permit, when "in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition."  33 C.F.R. § 325.2(e)(1)(i).  The Lake Oswego dock proposal meets none of these criteria.

51.     Following a notification of Letter of Permission sent by the Army Corps only to certain residents near the dock project site, the Army Corps received numerous comments from citizens and community organizations opposing the project.  The Army Corps received only one comment in support of the dock.  As a result, the Army Corps was on notice the project had encountered "appreciable opposition," so any determination to the contrary was unreasonable.  These adverse public comments warranted a standard permit process with a legitimate opportunity for notice and comment to and from the general public.

52.     The Letter of Permission further violates the RHA because the Lake Oswego dock does not qualify as "minor," and it will have significant environmental impact.  The district engineer cannot reasonably conclude the Lake Oswego dock project is "minor" and will not have a significant impact; the replacement dock will have a larger surface area than the existing dock, the project will change the purpose of the dock from industrial to recreational, and it will allow

up to thirteen large boats to dock where no docking has previously been permitted.  The Army

Corps' decision to issue a Letter of Permission for the Letter of Permission is unreasonable.

53.     For these reasons, the Army Corps' decision to issue Lake Oswego a Letter of

Permission was arbitrary, capricious, and an abuse of discretion, and actionable pursuant to 5

U.S.C. § 706(2)(A).

**CLAIM 5:      The Army Corps of Engineers violated the Rivers and Harbors Act and the
Administrative Procedure Act by approving construction of the Lake
Oswego dock without formal consultation.**

54.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

55.     RHA regulations require the Army Corps to initiate formal consultation with

NMFS if a proposed Section 10 project "may affect an endangered or threatened species or their

critical habitat."  33 C.F.R. 325.2(b)(5).

56.     As asserted, the Lake Oswego dock will adversely affect threatened salmonids,

may cause jeopardy to these protected runs, and will adversely affect designated critical habitat

of Upper Willamette River chinook salmon, Upper Willamette River steelhead, Lower Columbia

River chinook, and Lower Columbia River steelhead.

57.     The Army Corps initiated formal Section 7 ESA consultation by requesting a

BiOp from NMFS for the dock project on July 9, 2007, but withdrew its request for consultation

upon receiving a SLOPES III variance from NMFS on November 2, 2007. As explained above,

the SLOPES III BiOp Section 7 consultation is insufficient to comply with the requirements of

the ESA, particularly with respect to designated critical habitat that the Corps determined in its

Biological Assessment may be affected by the dock project.

58.     The Army Corps' approval of Lake Oswego's dock construction, without undergoing adequate formal ESA consultation with NMFS, violates the RHA and is arbitrary, capricious, and an abuse of discretion, and actionable pursuant to 5 U.S.C. § 706(2)(A).

**CLAIM 6:     NMFS violated NEPA by failing to prepare an EA or EIS to support SLOPES III and its associated incidental take statement.**

59.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

60.     NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  To determine whether an EIS is necessary, an agency may first conduct an Environmental Assessment ("EA").  40 C.F.R. §§ 1501.4 and 1508.9(a)(1).  If the EA indicates the proposed action may have a significant impact, the agency must prepare an EIS before proceeding with the proposed activity.  42 U.S.C. § 4332(2)(C).

61.     The biological analysis required by the ESA compliments, but does not substitute for, the analysis required by NEPA.  Documents prepared under the ESA focus on the impact of the proposed action on endangered and threatened species.  Documents prepared under NEPA focus broadly on all aspects of the environment affected by a proposed action.  If an agency only prepares a BiOp, gaps may exist in the agency's environmental analysis.  Therefore, when the ESA would prohibit a project but for an incidental take statement, the incidental take statement must be supported by either an EA or EIS.

62.     NMFS violated NEPA because SLOPES III and its associated incidental take statement authorize activities that would be prohibited but for the incidental take statement because these activities result in the death or injury of protected salmonids. The activities authorized by SLOPES III and its incidental take statement first need to receive approval from the Army Corps.  However, this does not ensure the required NEPA analysis has taken place.

The Corps has never prepared an EA or EIS that considers the impacts on listed salmonids and their designated critical habitat stemming from the total additive take authorized by NMFS in the SLOPES III BiOp's incidental take statement; NEPA documents prepared by the Corps for individual projects do not attempt to assess this overall level of take. Consequently, no agency has done a NEPA analysis regarding the overall impacts on listed salmon and steelhead likely to result as a consequence of the total incidental take authorized by NMFS under the incidental take statement in the SLOPES III BiOp.

63.    NMFS violated NEPA by failing to prepare an EA or EIS to support the SLOPES III incidental take statement because no other comprehensive environmental analysis has been conducted, or will be conducted, prior to the approval of proposed activities that incidentally take protected species.  NMFS' failure to do so was arbitrary, capricious, and an abuse of discretion, and actionable pursuant to 5 U.S.C. § 706(2)(A).)

**CLAIM 7:    The Army Corps violated NEPA by preparing an insufficient Environmental Assessment.**

64.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

65.    When preparing an Environmental Assessment, an agency must determine whether the proposed federal action will have a significant impact on the human environment.  If it will, the agency must prepare an Environmental Impact Statement.  40 C.F.R. §§ 1508.9, 1508.13.  NEPA regulations define "significance" in terms of both context and intensity.  40 C.F.R. § 1508.27.  To evaluate intensity, an agency should consider a number of factors, including:

- "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial."
- "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risk."

- "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or breaking it down into small component parts."
- "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."

40 C.F.R. § 1508.27 (b). When consideration of these factors in an EA indicates a proposed action may have significant impacts, the agency must conduct an EIS.

66.    The Army Corps prepared a cursory EA for the Lake Oswego dock, after receiving public comment on the notification of Lake Oswego's RHA permit application, and made a Finding of No Significant Impact ("FONSI"). As a result of the FONSI, the Army Corps did not prepare an EIS for the dock project.

67.    The Army Corps did not publicly notice the EA, and concerned citizens and organizations did not have an opportunity to challenge the propriety of the FONSI before the Army Corps issued the RHA Section 10 Letter of Permission.

68.    The Army Corps violated NEPA by failing to consider required significance factors in its EA, and consequently issuing a FONSI for the dock project, which may have a "significant effect on the human environment." 40 C.F.R. § 1508.4.

69.    The dock proposal is "highly controversial," as indicated by comments submitted by the Tryon Creek Watershed Council and numerous individual Lake Oswego citizens. These communications occurred before the Army Corps issued the Letter of Permission, and clearly put the Army Corps on notice that the project has generated significant opposition, and at a minimum requires a more detailed and thorough EA.

70.    The effects of the dock on protected species are also highly uncertain, further undermining the Army Corps' FONSI determination. The SLOPES III BiOp makes no attempt

to quantify the number of threatened and endangered anadromous fish taken by the projects it authorizes, including the Lake Oswego dock. Rather, SLOPES III assumes no jeopardy will occur simply by limiting habitat destruction to a certain number of projects per year. This falls far short of the environmental sensitivity required; to receive a finding of no significant impact, the proposed action must not have substantial environmental effects. When effects are uncertain, the agency must prepare an EIS.

71.    The dock will likely have significant cumulative environmental impacts when considered along with other projects authorized by SLOPES III, as well as other federally authorized projects in the region. As established, no NEPA analysis has ever been conducted to consider the cumulative impact of the myriad projects authorized by SLOPES III. SLOPES III and its associated incidental take statement cover hundreds of projects per year, ranging from road construction, to "maintenance dredging," to in-water structures like the Lake Oswego Dock. The Army Corps' claim that the cumulative impact of these projects remains insignificant is simply untenable.

72.    NMFS has determined that projects authorized under SLOPES III will adversely affect species and designated critical habitat protected by the ESA. For instance, such in-water structures  provide habitat for non-native predatory species that feed on juvenile listed fish species. Just as this should have led NMFS to prepare an EA or EIS for SLOPES III as a whole, this adverse impact on listed species and their habitat, along with the factors indicating the dock's likely significant impact, call into question the Army Corps' FONSI determination.

73.    Therefore, the Army Corps' preparation of an inadequate EA and resulting unsupported FONSI for the Lake Oswego Dock violate NEPA and are arbitrary, capricious, and an abuse of discretion, and actionable pursuant to 5 U.S.C. § 706(2)(A).

## RELIEF REQUESTED

WHEREFORE, the Plaintiffs respectfully request that this Court:

A.        Adjudge and declare NMFS violated the ESA by relying on its SLOPES III BiOp to assess whether the Corps' proposal to authorize the Lake Oswego dock is likely to destroy or adversely modify the critical habitat of Upper Willamette River chinook salmon, Upper Willamette River steelhead, Lower Columbia River chinook, and Lower Columbia River steelhead.

B.        Adjudge and declare that the Corps has violated the RHA by issuing a Letter of Permission authorizing construction of the Lake Oswego dock, and by failing to comply with RHA regulations requiring the Corps to initiate ESA section 7 consultation with NMFS if a project may affect designated critical habitat of listed species.

C.        Adjudge and declare that the Corps violated NEPA by failing to adequately assess the environmental consequences of issuing a permit allowing construction of the Lake Oswego dock and arbitrarily concluding that the dock project will not have a significant impact on the quality of the human environment.

D.        Hold unlawful and set aside the Corps' Letter of Permission for the Lake Oswego dock project.

E.        Adjudge and declare that NMFS violated NEPA by failing to complete an EA or EIS prior to issuing a broad authorization to the Corps that allows the agency to approve myriad activities that directly kill or injure protected salmonids and cause habitat modifications that kill or injure protected salmonids.

F.        Adjudge and declare that NMFS' SLOPES III BiOp and associated incidental take statement violated the ESA by failing to analyze and consider the additive impacts of all

adverse effects resulting from activities within the scope of the BiOp and incidental take statement, and for failing to quantify the authorized level of incidental take or employ a lawful surrogate for estimating this level of take.

G.    Hold unlawful and set aside NMFS' SLOPES III BiOp and its associated incidental take statement.

H.    Grant plaintiffs such preliminary and permanent injunctive relief as they might from time to time request and as may be necessary to protect the environment and ESA-listed species until the Court decides the merits of this case or the agencies comply with the law;

E.    Award plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys fees, associated with this litigation; and

F.    Grant plaintiffs such further and additional relief as the Court may deem just and proper.

DATED this 8th day of August, 2008.


Respectfully submitted,

s/ Daniel J. Rohlf

Daniel J. Rohlf
OSB # 99006
Telephone: (503) 768-6707
Attorney for Plaintiff