Daniel J. Rohlf  (OSB#99006)
rohlf@lclark.edu
Tom Buchele (OSB# 081560)
tbuchele@lclark.edu
Pacific Environmental Advocacy Center
10015 S.W. Terwilliger Blvd.
Portland, OR 97219-7768
Telephone: (503) 768-6707 (Rohlf) (503) 768-6736 (Buchele)
Fax: (503) 768-6642

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NORTHWEST ENVIRONMENTAL DEFENSE CENTER** | Case No.: CV-08-939 MO |
| Plaintiff, | MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| v. | Pursuant to Fed. R. Civ. P. 56(a) |
| **NATIONAL MARINE FISHERIES SERVICE, U.S. ARMY CORPS OF ENGINEERS** | Request for Oral Argument |
| Defendants. | |

_____

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

**FACTUAL AND LEGAL BACKGROUND**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**JURISDICTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    **I.**   **NMFS Improperly Evaluated the Project's Impacts on Designated Critical Habitat of Listed Salmonids. (claim 4)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    **II.**   **NMFS' BiOp Makes Significant Errors and Fails to Reach Reasoned Conclusions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

        **A.**   **NMFS' BiOp violates the ESA by arbitrarily and improperly limiting the scope of the "action area." (Claim 2)** . . . . . . . . . . . . . . . . . . . . . 15

        **B.**   **The BiOp erroneously concludes that the project will not result in the creation of additional predator habitat. (Claim 1)** . . . . . . . . . . . . . . . . . . 18

    **III.**  **NMFS Issued an Unlawful Incidental Take Statement** . . . . . . . . . . . . . . . . . . .20

        **A.**   **NMFS Must Know How Much "Incidental take" It Has Already Authorized Before It Can Determine That Additional Incidental Take by A New Project Would Not Cause Jeopardy. (Claims 3 and 6)** . . . . . . 20

        **B.**   **The Incidental Take Statement Fails to Impose Actual or Numerical Limits on the Dock's Allowable Take. (Claim 6)** . . . . . . . . . . . . . . . . . . . .22

    **IV.**  **The Corps Violated the Rivers and Harbors Act By Failing to Identify and Analyze the Need for the Dock and Failing to Perform the Requisite Balancing. (Claim 5)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    **V.**   **The Corps Violated NEPA by Preparing an Inadequate and Incomplete Environmental Assessment. (Claim 7)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

        **A.**   **The EA's cumulative impact analysis ignores past, present, and future actions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

       **i.**    **The cumulative impact analysis ignores past actions by improperly limiting the scope of the analysis and failing to establish a baseline** . .28

       **ii.**    **The cumulative impact analysis grossly underestimates the cumulative impact of the proposed dock by relying on the flawed BiOp** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

       **iii.**   **The Cumulative Impact Analysis Ignores Foreseeable Future Impacts by Simply Assuming this dock and future docks will not induce additional Boating** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   **B.**    **The Corps failed to Address Other Significance Factors** . . . . . . . . . . . . . 32

**REMEDY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF AUTHORITIES

**Cases**

*Alaska Wilderness League v. Shell Offshore, Inc.*
548 F.3d 815 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Amoco Prod. Co. v. Village of Gambell*
480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

*Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*
273 F.3d 1229 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Bark v. U.S. Bureau of Land Management*
No. CV 07-1536-MO, 2009 WL 279087 (D.Or. Feb. 5, 2009) . . . . . . . . . . . . . . . . . 4, 11, 28, 29

*Bennett v. Spear*
520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*Bering Strait Citizens v. U.S. Army Corps*
524 F.3d 938 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Citizens to Preserve Overton Park v. Volpe*
401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Conner v. Burford*
848 F.2d 1441 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*
538 F.3d 1172 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Defenders of Wildlife v. Babbitt*
130 F.Supp.2d 121 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Foundation for North American Wild Sheep v. U.S. Dep't of Agriculture*
681 F.2d 1172 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Friends of the Earth v. Hintz*
800 F.2d 822 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 25

*Idaho Sporting Congress v. Thomas*
137 F.3d 1146 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Kern v. U.S. Bureau of Land Mgmt.*
284 F.3d 1062 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Lands Council v. McNair*
537 F.3d 981 (9th Cir. 2008) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 28

*League of Wilderness Defenders v. U.S. Forest Serv.*
549 F.3d 1211 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Marbled Murrelet v. Babbitt*
83 F.3d 1068 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Nat'l Parks and Conservation Ass'n v. Babbitt*
241 F.3d 722 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*National Wildlife Federation v. National Marine Fisheries Service*
524 F.3d 917 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Native Ecosystems Council v. Dombeck*
304 F.3d 886 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Native Ecosystems Council v. U.S. Forest Serv.*
428 F.3d 1233 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Northern Cheyenne Tribe v. Norton*
503 F.3d 836 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ocean Advocates v. United States Army Corps of Eng'rs*
361 F.3d 1108 (9th Cir. 2004), *amended opinion* 402 F.3d 846 (9th Cir. 2005) . . . . . . . . . . 27, 28

*ONRC v. Allen*
476 F.3d 1031 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Or. Natural Res. Council v. Bureau of Land Mgmt.*
470 F.3d 818 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Pacific Coast Federation v. NMFS*
265 F.3d 1028 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12-13

*Pacific Coast Federation v. U.S. Bureau of Reclamation*
426 F.3d 1082 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Portland Audubon Society v. Lujan*
795 F.Supp. 1489 (D.Or.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Sierra Nevada Forest Protection Campaign v. Weingard*
376 F.Supp.2d 984 (E.D. Ca. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*TOMAC v. Norton*
240 F.Supp.2d 45 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

*TVA v. Hill*
437 U.S. 153 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Van Abemma v. Fornell*
807 F.2d 633 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Winter v. Natural Res. Def. Council, Inc.*
---U.S.----, 129 S.Ct. 365 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Statutes**

5 U.S.C. §§ 701, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

5 U.S.C. § 705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 33

5 U.S.C. § 706(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

16 U.S.C. §§ 1531, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1532 (19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

16 U.S.C. § 1536(b)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

16 U.S.C. § 1536(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

16 U.S.C. § 1536(b)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 1536(b)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

16 U.S.C. § 1536(b)(4)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

16 U.S.C. § 1538(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 1391(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

28 U.S.C. § 2202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

33 U.S.C. §§ 401 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

33 U.S.C. § 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 24

42 U.S.C. §§ 4321, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Regulations**

33 C.F.R. part 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

33 C.F.R. § 320.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

33 C.F.R. § 320.4(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 C.F.R. § 320.4(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

33 C.F.R. § 320.4(a)(2)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

33 C.F.R. § 320.4(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

33 C.F.R. part 322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

33 C.F.R. § 325.2(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

33 C.F.R. § 322.5(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

33 C.F.R. part 325 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

40 C.F.R. § 1501.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

40 C.F.R. § 1501.4(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

40 C.F.R. § 1501.4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

40 C.F.R. § 1502.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

40 C.F.R. § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 31

40 C.F.R. § 1508.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 31

40 C.F.R. § 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

40 C.F.R. § 1508.9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

40 C.F.R. § 1508.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 31

40 C.F.R. § 1508.27(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

40 C.F.R. § 1508.27(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

40 C.F.R. § 1508.27(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

40 C.F.R. § 1508.27(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

40 C.F.R. § 1508.27(b)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

40 C.F.R. § 1508.28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

50 C.F.R. § 222.102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

50 C.F.R. § 223.203(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

50 C.F.R. § 226.212(s)(8)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

50 C.F.R. § 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 18

50 C.F.R. § 402.14(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

50 C.F.R. § 402.14(g)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

**Federal Register**

63 Fed. Reg. 13,347 (Mar. 19, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

64 Fed. Reg. 14,308 (Mar. 24, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

64 Fed. Reg. 14,508 (Mar.25, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

64 Fed. Reg. 14, 517 (Mar. 25, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

70 Fed. Reg. 37,160 (Jun. 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

70 Fed. Reg. 52,630 (Sept. 2, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 11

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**Other**

U.S. Fish & Wildlife Serv., Columbia Fisheries Program Office, Tryon Creek Restoration Monitoring Project, http://www.fws.gov/columbiariver/programs/nativetrout/tryon_creek.html (last accessed Mar. 5, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tryon Creek Restoration Monitoring Project, FY2005-2007 Progress Report, 8 [Hereinafter 2005-2007 Restoration Report](available at http://www.fws.gov/columbiariver/publications/ Tryon_Creek_Restoration_Monitoring_Project_2005-2007_%20Progress_Report_Final.pdf) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

Tryon Creek Restoration Monitoring Project, FY2008 Progress Report, 10–11 (Feb. 2009) [Hereinafter 2008 Restoration Report] (available at http://www.fws.gov/columbiariver/ publications/Tryon_Creek_Restoration_Monitoring_Project_2008_%20Progress_Report.pdf Progress Report). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

NAT'L MARINE FISHERIES SERV. PROTECTED RES. DIVISION, NAT'L OCEANIC & ATMOSPHERIC ADMIN. OF THE U.S. DEP'T OF COMMERCE, FACTORS CONTRIBUTING TO THE DECLINE OF CHINOOK SALMON: AN ADDENDUM TO THE 1996 WEST COAST STEELHEAD FACTORS FOR DECLINE REPORT, 25 (June 1998). http://www.nwr.noaa.gov/ESA-Salmon-Listings/Salmon-Populations/Reports-and-Publications/upload/chnk-ffd.pdf [Hereinafter Factors Contributing to Decline]. . . . . . . . . . 18, 19

U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook (Mar. 1998), *available at* http://www.fws.gov/endangered/consultations/s7hndbk/ s7hndbk.htm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## INTRODUCTION

Plaintiff Northwest Environmental Defense Center ("NEDC") challenges actions by the United States Army Corps ("Corps") and National Marine Fisheries Service ("NMFS") that authorize construction of a dock facility in the Willamette River near Lake Oswego, Oregon. Though focused on a relatively small project, this case raises significant issues regarding efforts to restore the Willamette River watershed and its imperiled salmon and steelhead runs.

On a site-specific basis, NMFS and the Corps have steadfastly refused to properly consider the effects of the proposed dock on the nearby Tryon Creek watershed, a unique urban stream system which has been the focus of years of restoration efforts and is designated critical habitat for threatened Lower Columbia River steelhead. The proposed dock, which would provide additional habitat for predatory fish and attract more large boat traffic in the area, would be located only 700 feet from the mouth of Tryon Creek. Thus, the project poses new perils to the threatened salmonid species that have begun to return to restored critical habitat in the creek. Remarkably, even though NEDC's initial Complaint focused on NMFS's failure to consider impacts on critical habitat, including Tryon Creek, NMFS's subsequent site-specific Biological Opinion regarding the boat dock fails to even mention Tryon Creek in its analysis.

More generally, in authorizing the proposed dock both NMFS and the Army Corps have failed to meaningfully consider the collective adverse impacts of human activities on the Willamette watershed, which over many years have degraded its aquatic habitat to the extent that its native salmon and steelhead runs must now be protected under the Endangered Species Act ("ESA"). Although NMFS' Biological Opinion ("BiOp") notes that these anadromous fish runs face a high likelihood of extinction in part due to actions such as dock construction, neither the Corps' Environmental Assessment ("EA") nor NMFS' BiOp make a reasonable effort to assess

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

the environmental impacts of the proposed dock, together with the impacts of the scores of docks and similar facilities which have been constructed in the Willamette watershed since the River's salmon and steelhead were added to the ESA's protected lists a decade ago. To use a familiar analogy, NMFS and the Corps have assented to the addition of one more straw to the camel's back when the agencies have no idea how many straws the camel is already struggling to carry.

Defendants' approval of this boat dock must include consideration of both its localized impacts on Tryon Creek and its actual cumulative or additive impacts. Because of its failure to do that and because of other legally significant errors and omissions, Defendant NMFS violated the ESA , 16 U.S.C. §§ 1531, *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq*., by issuing the flawed November 5, 2008 BiOp for the Lake Oswego dock (the "BiOp"). Defendant Corps violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*., the APA, and the Rivers and Harbors Act ("RHA"), 33 U.S.C. §§ 401 *et seq*., by issuing an improper Section 10 RHA permit ("Permit") to build the dock and by issuing the flawed November 21, 2008 EA and unsupported Finding of No Significant Impact ("FONSI") under NEPA.

## FACTUAL AND LEGAL BACKGROUND

The Willamette River and the habitat it provides for threatened anadromous fish are fundamentally degraded and altered from historic conditions. USACE AR 29–31.[1] Since the 1870s, development began to strip away the riparian forests surrounding the river, resulting in

---

[1] The Corps' administrative record was submitted electronically as a single pdf document, numbered sequentially. Plaintiff's citation USACE AR 29–31 refers to the Corps' administrative record at the corresponding page numbers. NMFS' administrative record was submitted in separate pdf documents numbered 1 through 114. Plaintiff's citation to the corresponding NMFS' record would be NMFS AR 1 at 20–22, referring to NFMS' record, first pdf document, at pages 20 through 22, according to the page numbers indicated by the pdf reader, not necessarily the page numbers on the documents themselves.

large functional losses to the river's complexity and productivity and reducing salmon and steelhead habitat. *Id.* at 29–30. Once highly braided and complex, the Willamette River system was dramatically simplified through activities such as dredging and placement of bank stabilizing "revetments." *Id.* at 29. [2] Moreover, modern human activities such as agriculture, urbanization, industrial activities, mining, and timber harvest have caused water quality, aquatic habitat, and salmon and steelhead populations to suffer severe declines. *Id.*

In 1899, Congress passed Section 10 of the Rivers and Harbors Act. 33 U.S.C. § 403. Under Section 10 of the Rivers and Harbors Act, the Corps is tasked with reviewing all applications to construct structures, such as docks, in U.S. navigable rivers. *Id.* The Corps promulgated regulations to guide its review of Section 10 permit applications that require the Corps to "conduct a public interest review, balancing the 'benefit which reasonably may be expected to accrue from the proposal' against its 'reasonably foreseeable detriments' with consideration for the 'national concern for both the protection and utilization of important resources.'" *Friends of the Earth v. Hintz*, 800 F.2d 822, 830 (9th Cir. 1986)(*quoting* 33 C.F.R. § 320.4(a)(1)).

The Corps has made ample use of its permitting authority, and structures such as docks are now a pervasive sight along the Willamette River. Since 1900 the Corps has issued nearly 1,500 permits for structures in the Willamette alone. USACE AR 31. The rapid growth in the number of water-related structures brought with it corresponding harm to salmon and steelhead

---

[2] These activities and the resulting impacts reduced available salmonid rearing habitat by as much as 75 %. USACE AR 29. The initial changes to the Willamette River were only the beginning. Thirty-seven dams in the basin now block salmonid access to more than 435 miles of important stream and river spawning habitat, and compound the habitat destruction stemming from forest loss and channel simplification. *Id.* The dams also altered temperature regimes in the Willamette River and its tributaries, thereby creating unnatural conditions which adversely affect salmonids. *Id.*

through the destruction of near shore habitat, and through the creation of shaded areas underneath the structures which serve as habitat for fish that prey on salmon and steelhead. USACE AR 33, 37, 40.  The process of dock construction itself can also kill or injure fish due to the extreme sound pressure waves from the industrial hammering needed to drive piles into the river bottom. *Id.* at 36. Along with the many docks and the associated impacts, the Willamette River absorbs a large amount of boating activity. [3] Boating activity adversely affects salmonids due to engine noise and the creation of additional shaded areas. *Id.* at 37. It also can cause delayed migration, decreased foraging, and reduced juvenile growth and survival. *Id.* at 38.

In 1969, Congress enacted NEPA which, as this Court recently explained, requires all federal agencies to adequately assess the impact of federal actions "significantly affecting the quality of the human environment."  *BARK v. U.S. BLM*, No. CV 07-1536-MO, 2009 WL 279087, at *3 (D.Or. February 5, 2009)(Mosman, J.)( citations omitted) . NEPA's purpose is twofold: (1) insure that agencies carefully and fully contemplate the environmental effects of their actions, and (2) insure that the public has sufficient information to participate in the agency's decision. *Id. (*citations omitted). Among other things, NEPA requires agencies to assess the cumulative effects of an action *Id.( citing,* 40 C.F.R. 1508.7). Thus, the Corps is required to determine whether each project the Corps permits under RHA Section 10, such as the dock at issue here, will have a cumulatively significant effect on the environment.

In addition to the RHA and NEPA, the Corps' legal obligations grew when Congress passed the Endangered Species Act in 1973. The ESA represents "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *TVA v. Hill*, 437 U.S. 153, 185 (1978). Section 7 of the ESA requires that

---

[3] In 2004, the Willamette River experienced over 386,000 usage days by boaters. USACE AR at 31 Multnomah and Clackamas counties alone have close to 45,000 registered boats. *Id.*

every federal agency "shall, in consultation with and with the assistance of the Secretary, insure

that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize

the continued existence of any endangered species or threatened species." 16 U.S.C. §

1536(a)(2). The Section 7 consultation process culminates in NMFS, in the case of anadromous

fish species, issuing a BiOp "detailing how the agency action affects the species." *Id*. at

§1536(b)(3)(A). In its BiOp, NMFS must determine whether the proposed action is likely to

jeopardize the continued existence of listed species or result in the destruction or adverse

modification of critical habitat. *Id.* at §1536(a)(2). While technically only advice, the conclusion

of a BiOp typically has a "virtually determinative effect" on the action agency's conclusion as to

whether its actions comply with Section 7's jeopardy prohibition. *Bennett v. Spear*, 520 U.S.

154, 170 (1997).

The ESA also prohibits "take" of species listed as endangered, a ban that NMFS'

regulations extend to most threatened species. *See* 16 U.S.C. §1538(a); 50 C.F.R. Sec.

223.203(a).[4] Section 7(b)(4) of the ESA allows NMFS to include an incidental take statement

("ITS") as part of a BiOp that authorizes a federal agency to carry out activities that incidentally

result in take of listed species.[5] 16 U.S.C. § 1536(b)(4). To issue an ITS, NMFS must first

determine that the proposed agency action will not cause jeopardy to listed species. *See id.* at §

1536(b)(4)(A). Additionally, an ITS must specify the impact of any incidental taking caused by

the agency activity, set forth "reasonable and prudent measures" to minimize take of affected

---

[4] "Take" is defined in the ESA to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532 (19). NMFS' regulations define harm to include habitat modification or degradation when it actually kills or injures members of protected species. *See* 50 C.F.R. § 222.102.

[5] "Incidental take" refers to "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

species, and set forth "terms and conditions" that the federal agency must comply with to implement these reasonable and prudent measures. *Id.* at §1536(b)(4)(C).

In 1998, recognizing that the negative impacts discussed above were pushing salmonid populations towards extinction, NMFS listed Lower Columbia River steelhead as threatened.[6] Shortly thereafter, NMFS listed Lower Columbia River chinook and Upper Willamette River chinook,[7] Columbia River chum,[8] and Upper Willamette River steelhead as threatened.[9] In 2005, NMFS listed Lower Columbia River coho salmon as threatened,[10] and designated critical habitat for Lower Columbia River chinook, Columbia River steelhead, Upper Willamette River chinook, and Upper Willamette River steelhead.[11] The designated critical habitat includes the river area around Lake Oswego and Tryon Creek. Def. Ans. ¶15.

The Willamette River around Lake Oswego and the mouth of Tryon Creek—the location of the proposed dock—provides critical spawning and rearing habitat for the Lower Columbia River chinook and Lower Columbia River steelhead, and critical migration habitat for the Upper Willamette River chinook and Upper Willamette River steelhead ESUs. Tryon Creek provides designated critical habitat for Lower Columbia River steelhead spawning and rearing. Although the Corps has authorized hundreds of in-water structures, and, presumably, NMFS has been consulted under the ESA regarding the more recent authorizations, the additive impact on listed salmonids and their habitat from the hundreds of existing structures on the Willamette River has never been adequately assessed by the Corps or NMFS.

---

[6] 63 Fed. Reg. 13,347 (Mar. 19, 1998).
[7] 64 Fed. Reg. 14,308 (Mar. 24, 1999).
[8] 64 Fed. Reg. 14,508 (Mar.25, 1999).
[9] 64 Fed. Reg. 14, 517 (Mar. 25, 1999).
[10] 70 Fed. Reg. 37,160 (Jun. 28, 2005).
[11] 70 Fed. Reg. 52,630 (Sept. 2, 2005).

At some point in 2003, Lake Oswego and the Corps began the permitting process to build a dock for large boats (most people would call them "yachts") at mile 20.4 of the Willamette River adjacent to the mouth of Tryon Creek. *See* USACE AR 912 (Draft EA dated September 2003). The process could be described as convoluted at best. The Corps first received an application from the City of Lake Oswego in May of 2005. NMFS AR 56 at 1. That permit request was withdrawn in August of 2005 in response to comments received from both the public and agencies. USACE AR 14. In July of 2007, the Corps requested formal consultation with NMFS. *Id.* However, after a subsequent redesign of the project, the Corps requested approval from NMFS under the Standard Local Operating Procedures ("SLOPES") BiOp. *Id.*

The SLOPES III BiOp was the third in a series of programmatic BiOps issued by NMFS that considered the impacts to endangered and threatened species from 'routine' projects under the assumption that certain specified 'standard operating procedures' are followed for each type of project. NMFS AR 58 at 7-11. SLOPES III acknowledged that in-river structures such as boat docks harm, and result in take of, threatened and endangered juvenile salmon in a number of ways. *Id.* at 92-93. These impacts result both from construction of authorized projects themselves and the habitat loss and alteration associated with these structures. Id. at 74-77, 92-93. Considering the large number of Corps issued permits for in-water structures, such as docks, the need for a programmatic approach utilizing a broad-scale analysis of the impacts is important both in the context of the ESA and NEPA. Unfortunately, SLOPES III suffered from numerous flaws which rendered ineffectual its otherwise laudable goal of assessing programmatically the impacts of facilities construction on the lower Willamette River. [12]

---

[12] For example, SLOPES III did not attempt to quantify take attributable to habitat loss and alteration caused by the many facilities it authorized. NMFS AR 58 at 107-09. Additionally, SLOPES III made no effort to assess the additive impacts to listed salmon due to the authorized

Although recognizing that the design of the proposed dock project did not fit within the parameters of SLOPES III, NMFS still authorized the project by issuing a variance from specific size requirements. USACE 14, NMFS AR 47 at 1. On November 20, 2007, the Corps issued a Letter of Permission under RHA section 10 to the City of Lake Oswego, authorizing the City to construct the dock. USACE AR 464.  The Corps issued the Letter of Permission over objections by the Tryon Creek Watershed Council and numerous affected citizens. USACE 611, 612.

Throughout the permitting process, concerned citizens and organizations submitted comments arguing that the proposed dock would adversely affect the ongoing efforts to restore salmonid habitat in Tryon Creek. USACE AR 196, 207, 260, 823. NMFS and the Corps acknowledged that restoration efforts at Tryon Creek have improved habitat conditions for salmonids. Defs' Answer, ¶ 16. Somewhat ironically, NMFS is among the partners spearheading the restoration and monitoring efforts. [13] Monitoring indicates that steelhead and coho salmon are both present in Tryon Creek. [14] Monitoring has also discovered Chinook salmon and that "juvenile salmon can, and have, successfully navigated upstream into Tryon Creek".[15]

---

amount of construction, nor did it add up the collective incidental take of listed salmon and steelhead. *See id.* at 108. Further, the SLOPES III BiOp's total overall incidental take authorization also never underwent any NEPA analysis.

[13] *See* U.S. Fish and Wildlife Service, Columbia Fisheries Program Office, Tryon Creek Restoration Monitoring Project, http://www.fws.gov/columbiariver/programs/nativetrout/tryon_creek.html (last accessed Mar. 5, 2009).

[14] Tryon Creek Restoration Monitoring Project, FY2005-2007 Progress Report, 8 [Hereinafter 2005-2007 Restoration Report](available at http://www.fws.gov/columbiariver/publications/Tryon_Creek_Restoration_Monitoring_Project_2005-2007_%20Progress_Report_Final.pdf).

[15] Tryon Creek Restoration Monitoring Project, FY2008 Progress Report, 10–11 (Feb. 2009) [Hereinafter 2008 Restoration Report] (available at http://www.fws.gov/columbiariver/publications/Tryon_Creek_Restoration_Monitoring_Project_2008_%20Progress_Report.pdf Progress Report).

On August 8, 2008, NEDC filed and served its initial complaint challenging the NMFS SLOPES III BiOp as applied to the Lake Oswego Dock and the Army Corp's Letter of Permission and supporting NEPA documents. USACE AR at 310. In early September 2008, in direct response to the allegations in NEDC's initial complaint, NMFS and the Corps essentially withdrew their earlier ESA, NEPA and RHA documentation regarding the Lake Oswego dock and started over. *See Id*. at 813. On September 8, 2008, the Army Corp notified the City of Lake Oswego that the letter of permission was "suspended." Id. at 63. On September 11, 2008, the Army Corps issued a new public notice seeking public input on a RHA Section 10 permit for the Lake Oswego Dock that is essentially identical to the Letter of Permission. See USACE AR 64. NEDC and many others individuals and organizations submitted comments that were highly critical of the proposed permit. Id. at 197, 200, 259. Those comments noted, among other things, that the currently planned dock would not have any sewage disposal facility, although it would allow about 17 non-trailerable recreational boats to dock for as long as three days. USACE AR 45, 205. The construction work would degrade habitat and water quality, but the project's adverse impacts would not cease when the dock is complete. Once constructed, the dock would provide shelter for predatory fish, increase sediment pollution, and cause other direct and indirect adverse impacts to threatened species' habitat and water quality. see USACE AR 33-45.

In September of 2008, both NMFS and the Corps requested that formal consultation be reinitiated under the ESA. USACE AR 14. Around November 5, 2008, less than two months after reinitiating consultation, NMFS issued a site-specific BiOp. USACE AR 12. On November 21, 2008, only about 10 weeks after issuing its public notice, the Corp issued an 18 page EA and FONSI.[16] USACE AR 63-80. NMFS' new site-specific BiOp for the Lake Oswego dock project

---

[16] The Corps did not circulate a draft of its EA for public comment. USACE AR 64.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

finds that, although the dock will have adverse effects on listed salmonids, if the permittee

follows certain mitigation measures, the proposed dock is not likely to jeopardize the continued

existence of listed salmonids, and will not result in the destruction or adverse modification of

designated critical habitat. USACE AR 41. Rather than resolve the problems with authorizing the

project under the SLOPES III variance, NMFS' new site-specific BiOp and the Corps' EA make

the problems worse by taking an overly narrow view of the proposed dock's impacts and

ignoring the bigger picture. On December 1, 2008, based on the revised EA and site-specific

BiOp, the Corps issued an RHA Section 10 permit for the dock. USACE AR 62. NEDC now

challenges these new and revised ESA, NEPA and RHA documents and decisions.

## JURISDICTION

Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 & 1346 because this action

involves United States agencies as defendants and arises under the laws of the United States. The

requested relief is proper under 28 U.S.C. § 2202 and 5 U.S.C. §§ 705 & 706. Venue is proper in

this Court pursuant to 28 U.S.C. § 1391(e). NEDC's standing is established by supporting

declarations from Mark Riskedahl and Craig Johnston.

## STANDARD OF REVIEW

Judicial review of NEDC's claims is governed by the Administrative Procedure Act

(APA), 5 U.S.C. § 706. *Pacific Coast Federation v. U.S. Bureau of Reclamation*, 426 F.3d 1082,

1089(9th Cir. 2005)(ESA); *Alaska Wilderness League v. Shell Offshore, Inc.*, 548 F.3d 815,

821(9th Cir. 2008) (NEPA); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830 (9th Cir. 1986)

(RHA). Under the APA, a court shall set aside agency action that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," or when it is found to be "without

observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). A decision is arbitrary and

capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008 (en banc). Under this standard, the reviewing court must undertake a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971), and ensure that the agency took "a 'hard look' at the potential environmental consequences of the proposed action." *Or. Natural Res. Council v. Bureau of Land Mgmt.*, 470 F.3d 818, 820 (9th Cir. 2006); see also *Bark, 2009 WL 279087, at*3* (discussing appropriate deference to agency expertise).

**ARGUMENT**

I.    **NMFS Improperly Evaluated the Projects' Impacts on Designated Critical Habitat of Listed Salmonids.  (CLAIM 4)**

In 2005, NMFS designated the Lower Willamette/Columbia River Corridor as critical habitat for the threatened Lower Columbia River chinook salmon, Lower Columbia River steelhead, Upper Willamette River chinook salmon, and Upper Willamette River steelhead. 70 Fed. Reg. 52,630 (Sept. 2, 2005). This critical habitat includes Willamette River mile 20.4, the site of Lake Oswego's proposed dock. *Id.* Tryon Creek is also designated critical habitat for steelhead. 50 C.F.R. §226.212(s)(8)(i); Def. Ans. ¶15.

NMFS, through the consultation process, is tasked with providing advice to federal agencies as to whether a proposed action is likely to destroy or adversely modify designated critical habitat. A BiOp must provide a detailed analysis as to a proposed federal action's impacts on critical habitat and whether those impacts are likely to constitute destruction or adverse

modification of that habitat. *See* 16 U.S.C. § 1536(b)(3)(A). BiOps must take all impacts into account to satisfy this requirement. *See* 50 C.F.R. §402.14(g)(1).

In the BiOp, NMFS concluded that the Lake Oswego dock project "will not result in the destruction or adverse modification of designated critical habitat." NMFS AR 1 at 32. Although the BiOp determined that the dock "will also have an adverse impact on critical habitat [Primary Constituent Elements]" for salmon and steelhead, it nevertheless erroneously determined that this would result in only a "minor reduction" in the conservation value of critical habitat within the unduly narrow action area. *Id.* at 34. This conclusion is arbitrary, capricious and contrary to law in violation of the ESA for multiple reasons.

Tryon Creek, one of the few remaining relatively intact urban watersheds in the Portland metropolitan area, has seen an increasing numbers of steelhead, cutthroat trout, and even coho salmon returning to its waters. 2005-2007 Restoration Report at 1 (noting that "Tryon Creek is one of the largest, relatively protected, urban watersheds in Oregon"); *id.* at 8 (finding steelhead, coho salmon, and cutthroat trout present in Tryon Creek); 2008 Restoration Report at 10–11 (Chinook salmon also present, and evidence of successful salmonid navigation into and out of Tryon Creek). The mouth of Tryon Creek lies within the action area of the proposed dock, approximately 700 feet from the dock itself.

NMFS concluded that construction and operation of the facility would  not destroy or adversely modify critical habitat without any analysis whatsoever of the project's impacts on this important Willamette River tributary. The agency's failure to analyze or discuss impacts to Tryon Creek in assessing impacts to critical habitat is a quintessential example of an agency failing to consider an important aspect of the problem, thus undermining NMFS' conclusion that the project is not likely to destroy or adversely modify critical habitat. *See Pacific Coast*

*Federation v. NMFS*, 265 F.3d 1028, 1034-38 (9th Cir. 2001)(failure to consider relevant factors when preparing BiOp is arbitrary and capricious).

      Substantial information in the record indicates that construction and operation of the proposed dock could adversely affect salmon runs in Tryon Creek. The EA for the dock demonstrates that the Corps was concerned about the dock's potential effects on the creek. When assessing alternative locations for dock placement, the Corps noted that "[t]he downstream location . . . would result in construction closer to Tryon Creek. This creek is important to steelhead spawning and rearing. This alternative location was removed from consideration to minimize impacts to these aquatic species." USACE AR 72. Outside experts also expressed concerns about impacts to Tryon. Dr. Steve Kolmes, a respected fisheries biologist and former member of NMFS' Technical Recovery Team for the Lower Columbia Basin, submitted comments stressing that the proposed dock would adversely impact salmonids near Tryon Creek by increasing the amount of shaded habitat ideal for predatory fish. NFMS AR 42 at 25-31.

      NMFS acted unreasonably by failing to consider the dock's proximity to Tryon Creek and assess the extent to which the dock could affect listed salmon and steelhead's use of critical habitat within the Tryon watershed. NMFS was well aware of the presence of Tryon Creek, as indicated by the photo of the BiOp's action area that labels the creek by name and the fact that the mouth of the creek is located within the project's action area.[17] NMFS AR 1 at 9. However, the agency reaches its "minor reduction" of critical habitat conclusion without specifically considering the proximity and importance of the Tryon Creek watershed to the critical habitat that would be degraded by the project, including the critical habitat in Tryon Creek itself. This omission starkly calls into doubt NMFS' analysis and conclusion about the project's impacts on

---

[17] Plaintiffs demonstrate in Section II A, *infra*, that NMFS defined the action area too narrowly, but the mouth of Tryon Creek is within even this unreasonably restrictive action area.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

critical habitat. See *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (citing 16 U.S.C. § 1536(a)(2))(under the ESA agencies cannot ignore relevant biological information)**.[18]**

Additionally, NMFS' conclusion that construction and operation of the proposed dock will not destroy or adversely modify critical habitat rests primarily on NMFS' assertion that the facility's admitted adverse impacts to critical habitat are "too small and brief to affect the conservation value of the Willamette River, or critical habitat as a whole." NMFS AR 1 at 34.[19] However, the mere fact that the dock's impacts may be "small" is not determinative. NMFS regulations require the agency to consider the "effects of the action" in its BiOp. 50 C.F.R. §402.14(g)(3). The regulations in turn define this term to include the effects of the project "that *will be added to* the environmental baseline," which includes the "past and present impacts of all Federal, State, or private activities in the action area." Id at §402.02 (definition of "effects of the action")(emphasis added). In other words, NMFS must assess a proposal's impacts on critical habitat in light of the current overall condition of critical habitat *plus* the additional impact of the new action under consideration. NMFS did not undertake such an analysis here.

The administrative record paints a grim picture of the current status of critical habitat for listed salmon and steelhead in the Willamette. NMFS' BiOp devotes three full pages to describing the terrible state of fish habitat in the Willamette ecosystem. *See* NMFS AR 20-22. In the project area, the BiOp concludes that "[t]he value of critical habitat for the species is limited by poor water quality, altered hydrology, lack of floodplain connectivity and shallow-water

---

[18] In addition, the draft Biological Assessment ("BA") for the project (submitted by the Corps) specifically mentioned the proximity of Tryon Creek and expressed uncertainty about the adverse impacts of dock construction on salmonids entering Tryon Creek. NMFS AR 16 at 48, 61. Although the BA only makes unsupported assertions about the impacts, at least the tributary's presence and its use by salmonids are recognized.

[19] As Plaintiffs demonstrate in Sections II A and B and III, infra, mistakes made by NMFS in its biological analysis of the proposed dock's impacts cast doubt on the agency's substantive conclusions about the magnitude of the dock's likely adverse impacts.

habitat, and lack of complex habitat to provide forage and cover." Id. at 23. It also notes that,

despite the poor condition of the Willamette, the Corps has issued permits to construct an

additional 142 structures in the Willamette since 2000 – a year *after* many of the river's salmon

and steelhead runs were listed as threatened or endangered. Id. at 22. Considering all of these

problems and additional adverse impacts since the listings, the draft Biological Assessment (BA)

of the proposed dock's impacts prepared by an independent biological consultant[20] concluded

that "*to ensure survival of the salmonid species*, *there must be a significant improvement in the*

*critical habitat* relative to existing environmental baseline conditions. Further degradation of

these conditions may have a significant negative impact on listed salmonids due to the risk

presently faced under the environmental baseline." NMFS AR 16 at 47 (emphasis added).

    In this light, the fact that NMFS found the additional environmental impacts of the

proposed dock to be "small" is insufficient to support a conclusion that the project will not

destroy or adversely modify critical habitat. The question NMFS should have asked is whether,

given the terrible state of critical habitat in the Willamette generally and in the area near the

proposed dock, the habitat can withstand additional adverse impacts from both construction and

long-term operation of the new facility. NMFS' BiOp simply did not analyze this question

despite the fact that its regulations require such an analysis and despite the fact that the draft BA

for the project found a likelihood of "significant negative impact" on listed salmonids due to

"further degradation" of the current environmental baseline. The BiOp's conclusion that the

proposed dock will not destroy or adversely modify critical habitat is thus arbitrary.

**II.    NMFS' BiOp Makes Significant Errors and Fails to Reach Reasoned Conclusions.**

    **A.    NMFS' BiOp violates the ESA by arbitrarily and improperly**
           **limiting the scope of the "action area." (Claim 2)**

---

[20] This draft BA was apparently never finalized. The record provides no indication why.

NMFS also acted contrary to its own regulations by arbitrarily limiting the action area for the dock to the parts of the Willamette River less than 1600 feet upstream and downstream from the project. NMFS must include all areas affected directly or indirectly by the project in the action area, but failed to do so here. Failure to properly define the scope of the action area undermined most of the analysis in the BiOp and rendered its conclusions regarding impacts on listed species and critical habitat arbitrary, capricious, an abuse of discretion and contrary to law. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 901–03 (9th Cir. 2002) (failure to include in the BA's action area all areas affected by proposed project held unlawful).

In this case, NMFS defined the action area in terms of "the linear extent of noise from driving the steel piles and the extent of turbidity," which it determined extended 1,594 feet upstream and downstream from the location of the dock. NMFS AR 1 at 9. The pressure waves generated by the industrial hammering necessary to install the piles can result in death or injury to salmonids by rupturing internal organs and damaging auditory systems. *Id.* at 27. The scope of the action area is incorrect and thus arbitrary because: (1) NMFS never attempted to determine the sound dispersal for installation of the 24-inch piles the project authorizes; and (2) Even while basing its calculations on smaller pile sizes, NMFS ignored the fact that behavioral impacts extend far beyond the distance marking the onset of physical injury to fish.

The BiOps' action area boundaries are directly contrary to NMFS' own calculations regarding the hydroacoustic impacts on fish from pile driving. The BiOp indicates that twelve steel piles, 24-inch or less in diameter, would be installed as part of the project. *Id.* at 27. In its BiOp, NMFS asserted that the "worst case scenario" for sound dispersal was used to calculate the action area boundaries. *Id.* at 27. Such an analysis should include the sound dispersal resulting from driving piles up to 24 inches in size, as the project authorizes. However, the

record makes it clear that NMFS' failed to analyze sound dispersal resulting from driving 24-inch steel piles. In determining the threshold distance from the piles within which death or injury to salmonids would occur, NMFS employed calculations designed for 14-inch and 20-inch steel piles, and assessed the threshold distance for fish weighing less than 2 grams. NMFS AR 6 AR at1; AR 7 at 1; AR 1 at 27.  NMFS then "split the difference" of these calculations to arrive at 1594 feet, the distance used to determine the action area boundaries. NMFS AR 6 at 1; AR 7 at 1. Given that the threshold distance which marks the onset of injury to fish increases with the size of the piles being driven, the glaring problem with the BiOp's action area is that it  ignores the fact that the project authorizes the use of 24-inch steel piles. *See* NMFS AR 1 at 27. NMFS apparently made no attempt to determine the threshold distance for 24-inch piles. Rather, NMFS just used a middle ground between the threshold distances for 14 and 20-inch piles. Moreover, by not even using the threshold distance calculated for 20-inch piles, NMFS certainly did not use the "worst case scenario" the agency allegedly employed.

NMFS' sound dispersal calculations and the resulting action area size also do not take into account the threshold distances for the onset of adverse behavioral effects. Behavioral impacts from pile installation extend far beyond the threshold distance which marks the onset of tissue trauma. *See* NMFS AR 6 at 1; AR 7 at 1. The same documents in the record that show NMFS' failure to analyze sound dispersal for the appropriate pile size also demonstrate that NMFS ignored the behavioral impacts of sound dispersal when determining the action area boundaries.

According to the record, when installing 20-inch piles—piles 4 inches smaller in diameter than the piles authorized by the project—behavioral effects to fish extend 2929 meters, or approximately 9607 feet from the project location. NFMS AR 6 at 1. Again, the action area

must include *all* areas affected directly and indirectly by the proposed project. 50 C.F.R. § 402.02; *see Native Ecosystems,* 304 F.3d at 901–03. Thus, NMFS' own regulations demand that the action area include the portions of the Willamette River and Tryon Creek where listed species' behavior would be impacted. Presumably, adverse behavioral impacts would extend even farther than 9607 feet had NMFS calculated the sound dispersal for the appropriate 24-inch pile size. In short, the action area should have been *at least six times larger* than the action area used in the BiOp. NMFS' erroneous action area definition directly affects what NMFS considers to be the extent of the "effects of the action" and the scope of the BiOp's cumulative impacts analysis. *See* 50 CFR § 402.02 (definition of "effects of the action"). NEDC is not challenging NMFS's methodology. Instead NEDC objects to the clear factual errors and omissions in how it applied its own methodology for determining the size of the action area. Thus, NMFS' biological determinations based on this erroneous action area  are arbitrary and capricious. [21]

>   **B.    The BiOp erroneously concludes that the project will not result in the creation of additional predator habitat. (Claim 1)**

Shade, such as that created by docks and moored boats, creates habitat especially suitable for predatory fish and thus adversely affects salmonids by increasing predator success. *See* NMFS AR 1 at 28. The proposed dock will provide attractive habitat for predators in the

---

[21] The record also offers no support for NMFS' conclusion that the proposed dock is unlikely to increase boating activity on the Willamette since no launch or ramp facilities are included as part of the project. *See* NMFS AR 1 at 5. However, given that the dock is aimed at "non-trailerable" boats, NMFS provides no rational explanation for its assertion that a new dock facility meant to attract more large boats to Lake Oswego will not increase boat use of the Willamette. See also discussion below, in Section V A(iii),  regarding a similar error in the Corps' EA.

22 Recommended strategies include: installing docks over 50 feet from shore, installing docks where low currents exceed 0.7 feet per second, and providing grating within the dock surface. Plans for the Lake Oswego dock only adhere to the last of these recommendations. NMFS AR 58 at 96–97.

[23] NAT'L MARINE FISHERIES SERV. PROTECTED RES. DIVISION, NAT'L OCEANIC & ATMOSPHERIC ADMIN. OF THE U.S. DEP'T OF COMMERCE, FACTORS

Willamette River immediately adjacent to Tryon Creek. In fact, the dock violates two of the three strategies recommended by NMFS to minimize predator attraction,[22] which is particularly troubling considering NMFS itself has recognized that such developments "have increased predation on juvenile salmon by creating ideal habitats for predators and nonnative species."[23] With increased predation levels due to habitat modification and introductions of nonnative species, chinook salmon populations have been declining, "particularly in areas where habitat alterations have tipped the predator/prey balance in favor of predators." Factors Contributing to Decline at 6-7. In general, "when a salmon stock suffers from low abundance, predation can contribute significantly to its extinction." NMFS AR 58 at 91.

The BiOp indicates that the area of aquatic habitat covered by the new dock's structures would be 2,936 feet. NMFS AR 1 at 36. Supposedly, due to the fact that the new dock would cover less aquatic habitat than the existing dock structures being replaced, the BiOp maintains that "there will be no increase of predation" resulting from the project. *Id.* at 28. The BiOp's analysis in this regard would potentially be correct—provided that no boats would ever dock at the facility. However, the proposed dock will transform a currently abandoned dock, which receives no boat use, into an actively used facility with docked boats that increase predator habitat. *Id.* at 28,33,36. NMFS recognized elsewhere in the BiOp that the aquatic habitat covered by the project also includes 6,120 square feet covered by the boats tied up at the facility. *Id.* at 36. This is more than twice the coverage of the proposed dock's permanent structures and even exceeds the coverage of the entire existing dock—including the portion that would remain

_____

CONTRIBUTING TO THE DECLINE OF CHINOOK SALMON: AN ADDENDUM TO THE 1996 WEST COAST STEELHEAD FACTORS FOR DECLINE REPORT, 25 (June 1998). http://www.nwr.noaa.gov/ESA-Salmon-Listings/Salmon-Populations/Reports-and-Publications/upload/chnk-ffd.pdf [Hereinafter Factors Contributing to Decline].

in place. *Id*. at 2, 36.  Given that "take due to predation will occur in an area immediately

adjacent to the completed structure and *any boats tied to the structure*," NMFS' analysis of the

effects of the proposed dock—indicating no increase in predation—simply defies logic. *Id. at 36.*

The BiOp never assesses the impacts from the large area covered by docked boats, it merely

includes the square footage as part of the incidental take statement, while on the other hand, the

BiOp's assessment of the effects of the action maintains its optimistic (and incorrect) "no

increase in predation" conclusion. The dock project would result in an increase in predator

habitat and would have real adverse impacts. NMFS' BiOp simply fails to address this reality.

NMFS conclusion is not supported by the record and does not represent a reasoned decision.

**III.     NMFS Issued an Unlawful Incidental Take Statement.**

NMFS found that incidental take of listed salmon is likely to result from the dock, and

NMFS included an incidental take statement ("ITS") with its BiOp. An ITS allows an agency

action to kill or injure, in the course of an otherwise lawful activity, a limited number of species

otherwise protected under the ESA, creating a sort of  "safe harbor" for agency actions.

However, because section 7 of the ESA explicitly allows only an amount of incidental take that

will not result in a violation of section 7's substantive standards, *see* 16 U.S.C. §1536(b)(4)(B),

an ITS must set forth a threshold for harm to a protected species that, if exceeded, requires

further evaluation to assess whether the level of take poses a problem. NMFS authorization of

incidental take for the dock, and the ITS itself, are contrary to the ESA for several reasons.

**A.     NMFS Must Know How Much "Incidental take" It Has Already Authorized
Before It Can Determine That Additional Incidental Take by A New Project
Would Not Cause Jeopardy. (Claims 3 and 6)**

Because the ESA mandates that the level of authorized incidental take be consistent with

ensuring against jeopardy, NMFS must have some awareness of the actual extent of additive

adverse impacts already in place on a listed species. NMFS must also have an approximate understanding of at what point survival and recovery will be placed at risk. "It is only logical to require that the agency know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from "significant" impairments to habitat that is already severely degraded." *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917, 936 (9th Cir. 2008). NMFS must have a grasp on these two variables because without analyzing the additive impacts in place on a listed species, and without knowing at what point a species will be jeopardized, NMFS is unable to rationally conclude that the level of incidental take authorized with the project is consistent with ensuring against jeopardy. *See Defenders of Wildlife v. Babbitt*, 130 F.Supp.2d 121, 127 (D.D.C. 2001) ("The impact of an authorized incidental take cannot be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other incidental take authorized by [the agency]"). One way to think of the problem is that NMFS essentially treats a listed species' population as a bank account. Each new ITS takes out a "withdrawal" by authorizing a specified level of take. This process can only guarantee that the authorized take is consistent with ensuring against jeopardy if NMFS is aware of two things: (1) the balance of the account; and (2) the amount of the withdrawal. In this case, however, NMFS is unaware of both.

For example, NMFS has acknowledged that existing docks, similar structures in the Willamette and lower Columbia Rivers, and shoreline development along the rivers pose significant threats to listed salmonids. NMFS AR 1 at 24-25. On the other hand, the BiOp does not even attempt to analyze or quantify in a meaningful way the  level of take stemming from the many similar structures that already exist in or along the Willamette. The BiOp notes that from 1900 to 1996, 1000 permits have been issued for structures in the Willamette River. NMFS AR 1

at 22. Further, since the species at issue here were listed in 1999, at least 142 additional permits have been issued. *Id.* However, NMFS made no effort to determine the amount of take or extent of harm previously authorized by the 142 structures permitted since the species' listings. NMFS also failed to assess and track the levels of incidental take of listed salmon and steelhead within the Willamette and lower Columbia Rivers stemming from other projects. The agency thus has no way of knowing whether the number of listed fish likely to be killed or injured as a result of this dock, together with the number of listed fish killed or injured by other causes—including other existing in-water structures —are likely to jeopardize the continued existence of the listed salmon and steelhead ESUs. Each such structure or shoreline development harms listed salmonids and degrades critical habitat, but NMFS does not consider when just one more dock or other harmful action is one too many for a species that migrates throughout its range.

NMFS' approach results in a process by which listed salmonids will inevitably be ushered into extinction by allowing "nickel and dime" impacts and "incidental take" to continue unabated because the take may be "small" – even though even a "small" withdrawal from a bank account can result in an overdraft if the balance in the account is low enough.. Here, by failing to consider the level of incidental take of listed salmon and steelhead caused by existing habitat conditions and asking whether the species can withstand still more, NMFS assessed incidental take resulting from the proposed dock in precisely the sort of "vacuum" that the *Defenders of Wildlife* court warned against. *See* 130 F.Supp.2d at 127. NMFS' incidental take authorization is therefore arbitrary and capricious.

### B. The Incidental Take Statement Fails to Impose Actual or Numerical Limits on the Dock's Allowable Take. (Claim 6)

The ITS is also invalid because NMFS failed to place any real limit on the amount of take authorized and instead relied upon a surrogate measure of take without adequately explaining why a numerical limit was not possible. In addition, by defining the amount of incidental take in a manner coextensive with the parameters of the proposed project, the ITS fails to set forth an adequate trigger for the reinitiation of consultation.

In *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1249 (9th Cir. 2001), the Ninth Circuit explained that "Incidental Take Statements set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate [section 7] consultation." Thus an ITS is invalid if it lacks "measurable guidelines to determine when incidental take would be exceeded," or fails "to set forth a trigger that would invalidate the safe harbor provision and reinitiate the consultation process." *ONRC v. Allen*, 476 F.3d 1031, 1038–39 (9th Cir. 2007). In *ONRC*, the Ninth Circuit held that an incidental take statement was invalid when it authorized a level of take that included "all spotted owls associated with the removal and downgrading of 22,227 acres of suitable spotted owl habitat." *Id.* at 1039. The court determined that such a limit on incidental take was really no limit at all since "the permissible level of take is coextensive with the project's own scope." *Id.* The court noted that "no matter what kind of limitation on take the FWS chooses to place in the Incidental Take Statement, it cannot be so indeterminate as to prevent the Take Statement from contributing to the monitoring of incidental take by eliminating its trigger function." *Id.* at 1041. The court also recognized that "Congress preferred take be specified in terms of a numerical limitation. A surrogate is permissible if no number may be practically obtained. The chosen surrogate, however, must be able to perform the functions of a numerical limitation." *Id.* at 1038 (citations and internal quotations omitted).

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Instead of assessing likely actual take of salmon and steelhead or sufficiently explaining why it was not possible to estimate such take, NMFS simply used the dock project's parameters as the surrogate measure of, as well as the limit of, incidental take of listed salmon and steelhead. Specifically, NMFS used "the area of the aquatic habitat to be covered" and "3,600 pile strikes per day," as the limit of allowed take. NMFS AR 1 at 36. Such a "limit" on incidental take is actually no limit at all and fails to provide any standard by which to monitor harm to listed salmonids and recognize when an excessive level of harm is occurring and reinitiation of section 7 consultation must take place.

NMFS has made no attempt to correlate the dock parameters used as the surrogate for take to the likely actual take of salmon and steelhead, nor provided a sufficient explanation for why it cannot establish a numeric limit on incidental take of fish in the project area and over time. [24] Therefore, the dock project parameters are arbitrary and capricious standards for measuring incidental take, in violation of the APA and ESA, that do not directly correlate to actual take levels, and as such cannot be accurately used by NMFS to gauge the incidental take resulting from construction and operation of the dock.

**IV.    The Corps Violated the Rivers and Harbors Act By Failing to Identify and Analyze the Need for the Dock and Failing to Perform the Requisite Balancing. (Claim 5)**

Under section 10 of the Rivers and Harbors Act, the Corps is tasked with reviewing all applications to construct docks in U.S. navigable rivers. 33 U.S.C. § 403. The Corps has promulgated regulations to guide its review of section 10 permit applications. 33 C.F.R. Part 320, 322, 325. The regulations direct the Corps to "conduct a public interest review,

---

[24] NMFS has acknowledged that, in order for a surrogate measure for incidental take to be acceptable, a "causal link" between the surrogate measure and incidental take must be established. U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook, 4-47 to 48 (Mar. 1998), *available at* http://www.fws.gov/endangered/ consultations/s7hndbk/ s7hndbk.htm.

balancing the 'benefit which reasonably may be expected to accrue from the proposal' against its 'reasonably foreseeable detriments' with consideration for the 'national concern for both the protection and utilization of important resources.'" *Friends of the Earth*, 800 F.2d at 830. The "public interest review" requires consideration of  "the relevant extent of the public and private need for the proposed structure", any reasonable alternatives, and "the extent and permanence of beneficial an/or detrimental effects". 33 C.F.R. § 320.4(a)(2). Additional factors must sometimes be considered, 33 C.F.R. § 320.4, and public comments must be considered. 33 C.F.R. Sec. 320.4(a)(3). After balancing the mandatory and conditional factors, the Corps must prepare a report setting forth its findings. 33 C.F.R. § 325.2(a)(6).

The court's role in reviewing the Corps' public interest determination is to "consider whether the Corps followed required procedures, evaluated relevant factors and reached a reasoned decision." *Van Abemma v. Fornell,* 807 F.2d 633, 636 (7th Cir. 1986). "The Corps' conclusions must find some reasonable support in the record." *Id.* at 639.  In *Van Abemma*, the court vacated a section 10 permit after the Corps' public interest review was found to be based on dubious factual reports. The *Van Abemma* court said although the project may be justified, "we cannot approve a public interest review entirely indifferent to the facts." *Id.* at 642. Worse than reliance on incorrect facts, in this case the Corps did not even attempt to gather the relevant facts.

The Corps' public interest review here is arbitrary because it completely fails to evaluate the "relevant extent of the public and private need for the proposed structure." 33 C.F.R. § 320.4(a)(2)(i). The EA's "Purpose and need" section states in its entirety: "The purpose of the proposed project is to construct a docking facility primarily for recreational vessels greater than 26 feet in length. The dock is designed specifically to accommodate non-trailerable boat users on the Willamette River to access downtown commercial opportunities in the city of Lake Oswego

and recreational opportunities at Rohr Park and Foothills Park." USACE AR 64. No level of

agency deference can overcome the Corps' complete failure to identify and assess 'the relative

extent of the need,' one of only three mandatory factors.

The Corps also fails to perform the requisite balancing. The "Public Interest

Determination" section of the EA states "[b]ased on the above analysis of impacts and after

weighing the factors described in this EA, I find that issuance of a Department of the Army

permit . . . is not contrary to the public interest." USACE AR 80. This conclusory statement is

not supported by the necessary reasoned analysis.  *See Van Abemma*, 807 F.2d at 636-642. The

Corps may not cast aside the balancing process mandated by regulation and satisfy its obligation

with a conclusory sentence. This is not a case where the Corps poorly balanced the relevant

factors; here, the Corps failed to perform the necessary balancing altogether.[25]

**V.    The Corps Violated NEPA by Preparing an Inadequate and Incomplete
        Environmental Assessment. (Claim 7)**

NEPA requires federal agencies to prepare an environmental impact statement (EIS) before

undertaking any action that will have a *significant affect* on the quality of the environment.  42

U.S.C. § 4332(2)(C). "[A]n EIS must be prepared if 'substantial questions are raised as to

whether a project . . . may cause significant degradation of some human environmental factors.'"

*Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)(overruled on other

grounds by *Lands Council*, 537 F.3d 981). Whether an action's effects are 'significant' requires

consideration of many factors, including those set out in the Council on Environmental Quality's

NEPA regulations. 40 C.F.R. § 1508.27. Satisfying even  one of these factors may suffice to

---

[25] The Corps may respond that 33 C.F.R. § 322.5(d) creates a presumption that "small boat docks" are in the public interest. If NEDC were challenging an actual balancing by the Corps this regulation might be relevant. Moreover, the 'small boat regulation' should not apply in this case because the dock is for "non-trailerable boats," i.e., yachts.  USACE AR 64.

reach the 'significance' threshold. *Ocean Advocates v. United States Army Corps of Eng'rs*, 361

F.3d 1108, 1125 (9th Cir. 2004),*amended opinion*, 402 F.3d 846, 865 (9th Cir. 2005).  If an

agency is uncertain whether an action will have a significant affect on the environment, the

agency may begin the environmental review process by preparing an EA. 40 C.F.R. § 1501.3, §

1508.9. An EA "shall include brief discussions of the need for the proposal, of alternatives . . .

[and] of the environmental impacts of the proposed action and alternatives."  40 C.F.R. §

1508.9(b). If the conclusion of the EA is that the action clearly will not have a significant affect,

then the EA should culminate in a finding of no significant impact (FONSI). 40 C.F.R.

§ 1501.4(e), § 1508.13. Otherwise, if "substantial questions" are raised, an EIS must be prepared.

40 C.F.R. § 1501.4(c). An agency must "undertake a thorough environmental analysis before

concluding that no significant environmental impact exists." *Native Ecosystems Council v. U.S.*

*Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005).

The Corps' violated NEPA by issuing an inadequate EA which resulted in an arbitrary and

unsupported FONSI. In response to NEDC's original complaint, the Corps hastily prepared a new

EA in about 10 weeks. Although the project history indicated that there were substantial

environmental issues surrounding the dock, the Corps did not circulate a draft EA for public

comment. The final EA is only eighteen pages, yet the EA is intended to satisfy the Corps'

obligations under NEPA as well as Corps regulations implementing the RHA.[26] Ultimately, the

EA must be deemed insufficient and the Corps' FONSI arbitrary because they ignore the actual

scope of the dock's affects, including in particular its cumulative effects, as well as evidence

regarding several other "significance" factors. These errors are not based on choice of

---

[26] Despite the purpose of the EA to determine whether the dock would have a significant affect, the EA fails to discuss, much less reference, the relevant CEQ factors for making this determination set out in 40 C.F.R. § 1508.27.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

methodology for sampling, testing, or analyzing.  *See Lands Council,* 537 F.3d at 991-995. The

EA and FONSI's  flaws are legal and factual errors, omissions, and unsupported assumptions.

### A.    The EA's cumulative impact analysis ignores past, present, and future actions.

A 'cumulative impact' is "the impact on the environment which results from the

incremental impact of the action when added to other past, present, and reasonably foreseeable

future actions regardless of what agency (Federal or non-Federal) or person undertakes such

other actions.  Cumulative impacts can result from individually minor but collectively significant

actions taking place over a period of time."  40 C.F.R. § 1508.7. A proper consideration of the

cumulative impacts of a project requires "some quantified or detailed information; ... [g]eneral

statements about possible effects and some risk do not constitute a hard look absent a

justification regarding why more definitive information could not be provided.' "  *Ocean

Advocates*, 361 F.3d at 1128 (*amended opinion*, 402 F.3d at 868)(internal quotations and

citations omitted). The analysis "must be more than perfunctory; it must provide a useful

analysis of the cumulative impacts of past, present, and future projects."  *Kern v. U.S. Bureau of

Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002)(internal quotations and citations omitted).The

EA improperly limits the scope of its cumulative effects analysis to "similar" docks for yachts,

includes no useful aggregated or baseline data regarding past and existing in-water impacts, only

references the flawed BiOp when considering the proposed dock's impacts on threatened

species, and simply assumes that this and future yacht docks will not cause boat traffic on the

river. This is not "a reasonably thorough and useful [cumulative impacts] analysis …that gives

the project the required "hard look.'" See *Bark,* 2009 WL 279087, at *4-6.

### i.    The cumulative impact analysis ignores past actions by improperly limiting the scope of the analysis and failing to establish a baseline.

The most blatant flaw in the EA's cumulative impact analysis is the improper limitation placed on the scope of the analysis. The analysis begins properly by recognizing that "docks on the river have caused loss of shallow water habitat and increased boat use on the Willamette from the mouth of the river to Willamette Falls." USACE AR 77. But the Corps inexplicably goes on to limit the scope of its cumulative impact analysis to only "transient facilities that are similar in nature and impact." *Id.* This limitation reduces the number of docks and other structures on the Willamette River that the Corps must consider in its cumulative impact analysis from as many as 1500, *id.* at 31, to only 7, *id.* at 77. There is no legal basis for unilaterally limiting the scope in this manner; the EA must consider all past actions. 40 C.F.R. § 1508.7.

This Court recently explained that an agency can choose to use baseline or aggregated data when considering cumulative impacts. *Bark,* 2009 WL 279087, at *5. NEDC does not object that the Corps used or poorly performed such a baseline analysis; NEDC asserts that, except for its very brief consideration of the seven "similar docks", the Corps omitted the baseline or aggregated analysis altogether. At a minimum, the Corps had a duty to collect aggregated or baseline data that took account of the construction and subsequent affect of all in-water structures on the Lower Willamette River. Indeed, NMFS specifically suggested that the Corps do this. USACE AR 43-44. The need for such analysis became particularly obvious after 1999 and 2005 when salmonids were listed and critical habitat on the Willamette was identified.[27] Yet, the Corps has never performed an actual assessment of the cumulative impacts from the projects

---

[27] Since 1999 the Corps has issued an additional 142 RHA section 10 permits, compounding the cumulative impacts. USACE AR 31.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

it authorizes on the Willamette River. [28] The EA's conclusory statement that docks have caused

habitat loss and increased boat use on the river could be the initial sentence of a proper

cumulative effects analysis, but here it is virtually the entire analysis. USACE AR 77.  Such

"analysis" cannot pass muster under even the most discretionary review.

> ### ii.    The cumulative impact analysis grossly underestimates the cumulative impact of the proposed dock by relying on the flawed BiOp.

For purposes of assessing the docks impacts on threatened salmonids, the Corps

uncritically adopted the BiOp's conclusions; the sole sentence providing the Corps' position

regarding impacts on salmonids states "[t]he Corps concurs with NMFS that the proposed project

is not likely to jeopardize . . . and would not result in the destruction or adverse modification."

USACE AR 71.  Even if the BiOp's analysis were correct, this simple and unadorned reference

to another agency's analysis pursuant to another statutory scheme cannot satisfy the Corp's

NEPA obligations.[29] NEPA and the ESA impose different analytical responsibilities and

compliance with one is simply not a substitute for compliance with the other. See, e.g*., Portland

Audubon Society v. Lujan*, 795 F.Supp. 1489, 1509 (D.Or.1992). A BiOp would be focused on

whether an action will result in "jeopardy" as defined by the ESA, while an EA, pursuant to

NEPA, would have to consider all adverse impacts on listed species. Similarly, the ESA allows

for a "cumulative impacts" analysis to be confined to a rather narrowly defined "action area",

---

[28] NEPA requires the Corps to consider the impacts other past actions on the river as well, including the historical dredging and revetment of the river, the substitution of walls for shoreline and pollution.

[29] If the Corps' reference to the BiOp is an attempt to "tier" to that document,  such 'tiering' is unlawful because the BiOp itself is not a NEPA document.  *See* 40 C.F.R. § 1508.28 (defining 'tiering' in the NEPA context); *League of Wilderness Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1218-19 (9th Cir. 2008).  NEPA does allow incorporation by reference, but the content of incorporated material must be at least "briefly described" and cannot be a complete substitute for the agency's own analysis. See 40 C.F.R. § 1502.21.

NEPA requires a much broader cumulative impacts analysis. The Corps has simply failed to include its own independent, NEPA-compliant analysis of the affect of the dock on salmonids.

The bigger problem for the Corps however is, as NEDS discussed above, that the referenced conclusions from the BiOp are based on an incomplete and flawed analysis. Indeed, even a cursory review of the BiOp by the Corp should have disclosed that NMFS improperly excluded impacts to Tryon Creek from the BiOp's analysis. The Corps' EA, in response to public comments, acknowledges that impacts to nearby Tryon Creek are possible, but inexplicably references the BiOp in response to such comments. The EA claims, that "the Corps and NMFS determine [the 700 foot distance between the dock and Tryon Creek's mouth] is adequate [to prevent adverse impacts]…[and] will not preclude anadromous fish from utilizing the Tryon Creek watershed." USACE AR 66.  The EA does not explain how NMFS reached such conclusions without even mentioning Tryon Creek in its BiOp.

> ### iii.    The Cumulative Impact Analysis Ignores Foreseeable Future Impacts by Simply Assuming this dock and future docks will not induce additional Boating.

The EA's cumulative impact analysis is also flawed because it fails to account for the inevitable induced increase in boating that this dock and future docks will create.[30] An action's cumulative impacts include "indirect effects", see 40 C.F.R §§ 1508.7, 1508.8, 1508.27,  which in turn include "growth inducing effects."  40 C.F.R. § 1508.8.  The Corps attempts to address induced demand in its cumulative impact analysis: "[t]he dock is not intended to increase river use but is designed to accommodate existing non-trailerable boat traffic"; "[i]t can reasonably be expected that future tie-in facilities would be constructed on the Lower Willamette River to accommodate recreational users . . . The individual impacts from future construction are not

---

[30] NMFS made a similar error in its BiOp. See discussion above at note 21.

expected to be significant as the facilities are not intended to increase usage but to attract current users to a variety of different recreational opportunities." USACE AR 77.[31]

This induced growth analysis is flawed for three reasons. First, the 'intended' purpose for the dock's 'design' is substituted for the actual affect of the dock. The intentions of the dock's builders are irrelevant. Second, the Corps seemingly directly contradicts itself in the EA by denying the dock will cause a demand for additional boats on the river in the cumulative impact analysis section but acknowledging elsewhere in the EA that the dock will result in more boat traffic. USACE AR at 73, 75, 76. Third, the Corps' assumption that the dock will not result in induced boat usage has no support in the EA. The Corps improperly fails to explain why no induced growth in boating will result from the construction of the dock, although the typical result of constructing a new facility is induced growth. *See, e.g., TOMAC v. Norton*, 240 F.Supp.2d 45, 50-52 (D.D.C. 2003) (setting aside NEPA document for, among other reasons, failure to adequately assess induced growth of construction of casino). [32]

**B.** **The Corps failed to Address Other Significance Factors.**

In addition to cumulative impacts, there were also other significance factors that the Corps' EA and FONSI failed to consider sufficiently. For example, the EA inadequately considered the unique characteristics of Tryon Creek State Park. See 40 C.F.R. § 1508.27(b)(3). To the extent the EA is actually requiring certain mitigation for future docks (see note 31), it would be establishing a precedent for future actions. See 40 C.F.R. § 1508.27(b)(6). Because the EA

---

[31] The EA's discussion of future docks also improperly assumes that the impacts of those docks would be reduced by certain mitigation measures. USACE AR 77. But there is nothing in the EA that actually requires such future mitigation or supports the Corps' conclusory assertions that this mitigation would be effective. See *Nat'l Parks and Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001) (requiring some showing that mitigation will occur and be effective).

[32] To the extent the Corps suggests no growth will be induced because the dock construction does not include construction of a boat ramp, USACE AR 77, see note 21 above.

simply adopts the flawed and limited analysis of the BiOp for its consideration of adverse impacts to threatened salmonids, it fails to adequately consider those impacts, see 40 C.F.R. § 1508.27(b)(9), and those impacts could be considered "highly uncertain". See 40 C.F.R. § 1508.27(b)(5). Finally, based on the public comments from scientists and other knowledgeable individuals and groups, the dock's impacts are highly controversial and those controversies are not adequately resolved by the cursory EA. See 40 C.F.R. § 1508.27(b)(4); *Foundation for North American Wild Sheep v. U.S. Dep't of Agriculture,* 681 F.2d 1172, 1182 (9th Cir. 1982).[33]

The Corps' EA and FONSI omit substantive relevant information and analysis and are, therefore, arbitrary and capricious. Where the record (*i.e.*, the cumulative impacts analysis) is significantly incomplete, the EA and FONSI should be vacated and remanded to the Corps for reconsideration. *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008)( explaining when proper remedy is remand).

## REMEDY

"The APA establishes the remedy for unlawful agency actions: a court "shall hold unlawful and set aside agency actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). NEDC respectfully requests this Court declare NMFS and the Corps violated the ESA, NEPA, and RHA, and hold unlawful and set aside the BiOp, EA and RHA section 10 permit.

NEDC also respectfully requests an injunction prohibiting the construction of the

---

[33] With regard to the "controversy" significance factor, it is noteworthy that the Corps failed to circulate a draft EA for public comment. While the circulation of a draft EA to the public is not always required, see *Bering Strait Citizens v. U.S. Army Corps*, 524 F.3d 938, 953 ( 9th Cir. 2008), it is likely that the Corps could have avoided many of the errors in its EA if it had circulated a draft for public comment. Cf. *Sierra Nevada Forest Protection Campaign v. Weingard*, 376 F.Supp.2d 984 (E.D. Ca. 2005)( invalid EA because of insufficient public involvement). At a minimum, NEDC believes the Corps' EA should be entitled to less deference because of this omission.

proposed dock, and any action taken in preparation for construction, until NMFS and the Corps demonstrate to this Court that they have complied with the ESA, NEPA, and RHA. Generally, courts apply a traditional balance of harms analysis to determine the appropriateness of injunctive relief in environmental cases. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). Injunctive relief is typically appropriate in environmental cases because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least long in duration, *i.e.*, irreparable." *Northern Cheyenne Tribe v. Norton,* 503 F.3d 836, 843 (9th Cir. 2007). In the context of an ESA violation, Congress has foreclosed the exercise of the usual discretion possessed by the court of equity and determined that the balance of hardships and the public interest always favors an injunction to protect the endangered species. *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996). Further, the presumption of public interest in favor of protecting species is not overcome in this case by the extraordinary situation involving national defense or military affairs. *Winter v. Natural Res. Def. Council, Inc.*, ---U.S.----, 129 S.Ct. 365 (2008). In this case, NEDC would suffer permanent or long lasting injury from construction of the dock while NMFS and the Corps would undergo no harm by imposition of an injunction. No legal remedy could compensate for the type of irreparable injury that would result from construction of the dock. Finally, NEDC respectfully requests an award of attorneys fees and expenses.

## CONCLUSION

Defendants undoubtedly will argue that this is just a case about one "small" boat dock, and that NEDC is seeking to impose unreasonable burdens on the analysis that they must do regarding such relatively minor projects. Of course even the analysis for a small project should not be allowed to completely ignore impacts on an adjacent state park where considerable private

and governmental efforts have been undertaken to restore salmonid critical habitat. More importantly however both the ESA and the NEPA explicitly recognize that even small actions can have cumulatively significant impacts and that such impacts must be analyzed and disclosed.

NEDC is not arguing that NMFS and the Corps must exhaustively document the impacts from prior river development every time the Corps authorizes another boat dock. But the problem here is that, based on the administrative record compiled by the defendants, NMFS and the Army have never analyzed or quantified the cumulative impacts from this sort of development.  This rather significant omission has occurred even though the Corps has been required to approve every such in-water project for more than a hundred years and NMFS has been required to consult with the Corps regarding those approvals since at least the listing of several salmonid species in 1999. Presumably, once these agencies gather and analyze the cumulative impacts data, they could "tier" to that data (if it is in a NEPA document) or possibly incorporate it by reference, when they authorize future projects. But there is no exception in the ESA or NEPA to the requirement to properly consider cumulative impacts simply because those impacts primarily occur because of multiple, small projects.

For all the above reasons, and for the reasons set forth in NEDC's motion, Concise Statement of Facts and supporting declarations, NEDC respectfully requests that the Court enter on order granting NEDC summary judgment under FRCP 56 and providing NEDC with all of its requested relief.

DATED this 6th day of March, 2009.          Respectfully submitted,

s/ Tom Buchele
TOM BUCHELE
OSB #  081560
(503) 768-6736
Attorney for Plaintiff

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT