IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTHWEST ENVIRONMENTAL
DEFENSE CENTER,

No. CV 08-939-MO

                Plaintiff,

OPINION

     v.

NATIONAL MARINE FISHERIES SERVICE
and the U.S. ARMY CORPS OF ENGINEERS,

              Defendants.

**MOSMAN, J.,**

      This case arises from the City of Lake Oswego's ("City") plan to demolish part of a barge

dock at River Mile 20.4 on the west bank of the Willamette River and replace it with a dock that

will provide a temporary moorage facility for non-trailerable boats.  The Northwest

Environmental Defense Center ("NEDC") has brought suit, challenging the approval of the

project by the National Marine Fisheries Service ("NMFS")[1] and the U.S. Army Corps of

Engineers ("Corps") under the Endangered Species Act  ("ESA"), 16 U.S.C. §§ 1531-1544, the

Rivers and Harbors Act ("RHA"), 33 U.S.C. §§ 401-426, and the National Environmental Policy

Act ("NEPA"), 42 U.S.C. §§ 4321-4370.

---

[1] The National Marine Fisheries Service is also known as the National Oceanic and
Atmospheric Administration Fisheries Service or NOAA Fisheries.  The parties refer to the
Fisheries Service as NMFS, therefore, I will do the same.

The matters now before the court are NEDC's Motion for Summary Judgment (#17) and NMFS and the Corps' Cross Motion for Summary Judgment (#23). I hold that NMFS and the Corps properly executed their supervisory functions under the ESA, RHA, and NEPA. Therefore, NEDC's Motion for Summary Judgment is DENIED and NMFS and the Corps' Cross Motion for Summary Judgment is GRANTED.

## BACKGROUND

I. **Dock Planning and Permitting Process**

The City originally requested funds from the Oregon State Marine Board ("OSMB") to construct a recreational boat dock in 2005. (USACE A.R. 256.)[2] The permit application was withdrawn by the Corps in 2006, pending resolution of concerns raised by the public regarding effects on boat traffic. (*Id.* at 257.) A new application was submitted in 2007, placing the dock closer to shore. (*Id.*) However, a consultation with NMFS revealed concerns regarding fish habitat effects from building the dock too close to shore, and the dock was again redesigned. (*Id.*) The current design of the dock places the dock both outside the navigation channel to avoid impacts on boat traffic and far enough from shore to avoid the near-shore habitat used by protected fish. (*Id.*)

On April 24, 2007, the City applied to the Corps for a Letter of Permission to construct the dock, as required by the RHA. (*Id.* at 86.) The Corps gave public notice of the project and solicited comments on May 1, 2007. (*Id.*) The Corps also initiated consultation with NMFS because the Willamette River is home to Lower Columbia River ("LCR") Chinook salmon, LCR

---

[2] Citations to USACE A.R. refer to the Administrative Record compiled by the U.S. Army Corps of Engineers and filed with this court on February 6, 2009, docket #16.

coho salmon, LCR steelhead, Columbia River chum, Upper Willamette River ("UWR") Chinook salmon, and UWR steelhead, which are protected under the ESA.  (*Id.* at 465.)  The Willamette is considered critical habitat for all the LCR and UWR Chinook salmon and steelhead.  (*Id.* at 398.)  The Corps determined that the scope of the work, with a variance for dock width to exceed six feet, was covered by a programmatic biological opinion issued by NMFS in 2004, known as SLOPES III, the Revised Standard Local Operating Procedures for Endangered Species.  (*Id.* at 533.)  They therefore withdrew the request for consultation.  (*Id.*)

The OSMB submitted a biological assessment analyzing the potential impact of the dock on listed species (*id.* at 535-72) and the Tryon Creek Watershed Council submitted an extensive critique of that assessment (*id.* at 612-20).  On November 20, 2007, the Corps issued a Letter of Permission to the City, authorizing construction of the dock.  (*Id.* at 464-66.)  Enclosures provided with the Letter of Permission indicate that the Corps had prepared an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI") as required by NEPA. (*See id.* at 488-97.)

NEDC filed this lawsuit on August 11, 2008.  The Corps suspended the Letter of Permission and reinitiated consultation with NMFS on September 8.  (*Id.* at 307-08.)  The Corps indicates that the reinitiation of consultation was necessary because it had come to the attention of the Corps that the SLOPES III biological opinion had been drafted before the Willamette was designated critical habitat for many of the listed salmonids.  (*Id.* at 398.)  The Corps then gave public notice of the intent to issue an RHA permit and solicited comments.  (*Id.* at 286-91.) Numerous comments were received.  (*Id.* at 195-97, 200-08, 215-22, 234-35, 245.)

On November 5, 2008, NMFS issued a new biological opinion ("BiOp").  NMFS

concluded that the project was not likely to jeopardize the continued existence of any ESA-listed

salmonids or destroy or adversely modify their critical habitat.  (BiOp 28.)[3]  The BiOp includes

an Incidental Take Statement ("ITS") limiting the take allowed during the project.  (*Id.* at 31-36.)

The Corps then conducted a second EA under NEPA and determined that an Environmental

Impact Statement ("EIS") was not necessary.  (USACE A.R. 63-80.)  Based on the EA, the Corps

issued a second FONSI.  (*Id.* at 79.)  On January 5, 2009, the Corps issued a permit to the City.

(*Id.* at 1-5.)  NEDC then filed an amended complaint challenging the actions taken by NMFS

under the ESA and by the Corps under NEPA and the RHA.

## II.     **The Current Dock Plan**

The existing plan calls for the demolition of a 400-foot section of the existing barge dock

(which is approximately 850 feet long), consisting of thirty-two steel pilings, and the

construction of the new dock in the same area.  (BiOp 2.)  The new dock will be eight feet wide

and 272 feet long and will be supported by twelve steel pilings.  (*Id.*)  Although the permit allows

the pilings to be up to twenty-four-inches in diameter, the government indicates that the City has

actually ordered sixteen-inch steel pilings.  (NMFS A.R. 39 at 3, lines 28-30.)[4]  The dock will

_____

[3] Citations to BiOp refer to the biological opinion prepared by the National Marine
Fisheries Service and found in Document 1 of the Administrative Record compiled by the
National Marine Fisheries Service and filed with this court on February 5, 2009, docket #14.
Citations to this opinion will reference the page number of the document, rather than the page
number of the pdf reader.

[4] Citations to NMFS A.R. refer to the Administrative Record compiled by the National
Marine Fisheries Service and filed with this court on February 5, 2009, docket #14.  Because the
record contains many documents with independent numbering, the citations will be to NMFS
A.R. Doc# at Page#.

consist of a transient dock built with prefabricated concrete float pods, a concrete abutment, and a grated aluminum gangway connecting the dock to a small wooden pier on shore.  (BiOp 2.) The installation of the pilings is expected to be completed with a vibratory hammer, rather than an impact hammer.  (NMFS A.R. 12.)

The new dock will be located further offshore than the current dock, in deeper water with faster currents.  (BiOp 29.)  Thus, the new structure is further from the shallow water habitat preferred by salmon, steelhead, and predatory fish.  (*Id.*)  The grating on the gangway will allow light to penetrate, as will the one-foot wide grated openings between the six-foot by eight-foot float pods.  (*Id.* at 2, 4.)  This makes the area less attractive to predatory fish.  (*Id.* at 24.)  Anti-perching devises will also be placed on top of the dock pilings to reduce avian predation.  (*Id.*)

Demolition of the old dock is expected to take three days.  (*Id.* at 3.)  In-water pile driving will take six days.  (NMFS A.R. 39 at 3, lines 29-30.)  All in-water work must be performed during the summer, July 1 to October 31, when the lowest number of ESA-listed fish are present. (BiOp 22.)

### III.   The Lawsuit

After originally bringing suit in August 2008, NEDC amended its complaint in January 2009, to take into account the new BiOp prepared by NMFS and the second permit issued by the Corps.  NEDC brought seven claims against NMFS and the Corps related to the permitting process for the dock.  Claim 1: NMFS's BiOp violates the ESA because its determination that the dock does not jeopardize the continued existence of listed salmon and steelhead is arbitrary and capricious, an abuse of discretion, and contrary to law.  Claim 2: NMFS's BiOp violates the ESA by arbitrarily and improperly limiting the scope of the "action area."  Claim 3: NMFS's BiOp

violates the ESA because it arbitrarily and illegally compares the adverse effects in a limited

"action area" with the status of the listed species throughout its entire range.  Claim 4: NMFS

violated the ESA by improperly evaluating the dock's impact on critical habitat of listed

salmonids.  Claim 5: The Corps violated the RHA by issuing a permit for the dock without

balancing the benefits and detriments of the project.  Claim 6: NMFS's incidental take statement

is in violation of the ESA because it fails to assess the total number of salmonids that will be

taken by the dock and at what level the take will require reinitiation of Section 7 consultation.

Claim 7: The Corps violated NEPA by preparing an insufficient EA.

Both parties have now moved for summary judgment on all claims.  In Part I, I examine

NEDC's five claims against NMFS under the ESA (Claims 1, 2, 3, 4, and 6).  In Part II, I analyze

Claim 5, brought against the Corps under the RHA.  Finally, in Part III, I examine Claim 7,

brought against the Corps under NEPA.

## STANDARD OF REVIEW

Section 706 of the Administrative Procedure Act ("APA") governs judicial review of

agency actions under the ESA, RHA, and NEPA.  5 U.S.C. § 706; *Pac. Coast Fed'n of*

*Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005) (ESA);

*Friends of the Earth v. Hintz*, 800 F.2d 822, 830-31 (9th Cir. 1986) (RHA); *Klamath-Siskiyou*

*Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) (NEPA).  The scope

of judicial review under section 706 is narrow, and a court must uphold an agency's action unless

it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or

"without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). If the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the court must uphold the agency's action. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004).

Further, the court generally must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *See Balt. Gas & Elec. Co.*, 462 U.S. at 103. It should not "act as a panel of scientists that instructs the [agency] . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty." *See Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc). The court should also "conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'" *Id.* at 993 (quoting *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)). And "'[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *Id.* at 1000 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

**DISCUSSION**

I.    **Claims 1, 2, 3, 4, & 6: Endangered Species Act ("ESA")**

The ESA was enacted "to provide a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved, [and] to provide a program

for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).

The Secretary of Commerce is responsible for listed marine species, including anadromous

salmonids, and administers the ESA through NMFS.  50 C.F.R. §§ 402.01, 223.102 (threatened

marine and anadromous species), 224.101 (endangered marine and anadromous species).[5]

NMFS issues regulations listing endangered and threatened marine species and

designating their critical habitat.  16 U.S.C. § 1533(a)(1), (3).  "Critical habitat" includes areas

occupied by the species "on which are found those physical or biological features (I) essential to

the conservation of the species and (II) which may require special management considerations or

protection."  *Id.* § 1532(5)(A)(i).  These physical and biological features are the primary

constituent elements ("PCEs") of critical habitat.  50 C.F.R. § 424.12(b).

Section 7 of the ESA directs each federal agency to insure, in consultation with NMFS,

"that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize

the continued existence of any" listed species or result in the destruction or adverse modification

of critical habitat.  16 U.S.C. § 1536(a)(2).  Consultation with NMFS is required if an agency

action "may affect" a listed species or critical habitat.  50 C.F.R. § 402.14.

---

[5] The ESA regulations were amended effective January 15, 2009 and again May 4, 2009. *See* Interagency Cooperation Under the Endangered Species Act, 73 Fed. Reg. 76,272 (Dec. 16, 2008) (to be codified at 50 C.F.R. pt. 402); Interagency Cooperation Under the Endangered Species Act, 74 Fed. Reg. 20,421 (May 4, 2009) (to be codified at 50 C.F.R. pt. 402).  Because the consultation in this case was completed on November 5, 2008, the court refers to the version of the regulations in effect at that time.

At the conclusion of a formal consultation, NMFS issues a biological opinion stating whether the proposed action is likely to "jeopardize the continued existence of" any listed species or adversely modify critical habitat.  16 U.S.C. § 1536(a)(4), (b); 50 C.F.R. § 402.14(h).  An action jeopardizes the continued existence of a listed species if it "would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  The "adverse modification" inquiry focuses on "whether, with implementation of the proposed Federal action, critical habitat would remain functional (or retain the current ability for the [PCEs] to be functionally established) to serve the intended conservation role for the species."  (NMFS A.R. 85 at 3.)

In preparing the biological opinion, NMFS must consider "the effects of the action and cumulative effects on the listed species or critical habitat."  50 C.F.R. § 402.14(g)(3).  The effects of the action include the direct and indirect effects, together with the effects of other activities that are interrelated or interdependent with the action, "that will be added to the environmental baseline."  *Id.* § 402.02.  The "environmental baseline" includes the impacts of all activities in the action area, the anticipated impacts of all proposed federal projects that have already undergone Section 7 consultation in the action area, and the impact of non-federal actions contemporaneous with the consultation process.  *Id.*  "Cumulative effects" are the effects of future *non-federal* activities "that are reasonably certain to occur within the action area."  *Id.*  Both the jeopardy and adverse modification analyses are "based on the effects of the action on the continued existence of the entire population of the listed species or on a listed population, and/or the effect on critical habitat as designated in a final rulemaking."  U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries

Serv., *Endangered Species Consultation Handbook* 4-34 (Mar. 1998), *available at*

http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm [hereinafter *Section 7*

*Handbook*].  NMFS must base its biological opinion on the "best scientific and commercial data

available."  16 U.S.C. § 1536(a)(2).

A.      *Claim 2: Scope of "Action Area"*

To formulate its biological opinion, NMFS must determine the geographic scope of the

"action area."  The "action area" includes "all areas to be affected directly or indirectly by the

Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02.

"[T]he determination of the scope of an [action] area requires application of scientific

methodology and, as such, is within the agency's discretion."  *Native Ecosystems Council v.*

*Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 414

(1976)).  The agency must explain the "scientific methodology, relevant facts, or rational

connections linking the project's potential impacts" to the action area boundaries to enable a

reviewing court to determine whether the action area was properly conceived.  *Id.*

1.      **NMFS's Determination of Action Area**

The effects of the proposed dock include those associated with the construction of the

dock and with the boating activities the dock will encourage.  (BiOp 21.)  The effect of the

boating activities will be in the immediate vicinity of the dock, however, the effects of dock

construction will expand beyond the dock's immediate area.  Therefore, NMFS has defined the

action area for the dock project as "the linear extent of noise from driving the steel piles and the

extent of turbidity."  (*Id.* at 5.)

PAGE 10 - OPINION

Pile removal and pile driving is expected to mobilize sediment in the river, elevating total suspended solids and turbidity in the immediate work area and for 500 to 1,000 feet up and downstream. (*Id.*) An increase in the total suspended solids in the river has both beneficial and detrimental effects on fish. (*Id.* at 22.) Elevated amounts of sediment can enhance cover conditions, reducing piscivorous fish and bird predation rates, but it can also cause physiological stress and reduce the growth of fish. (*Id.*) Given the small area of the river affected by the proposed dock, the temporary duration of the construction (about two weeks), and the small number of listed salmonids expected to be in the area during the summer work window, NMFS determined that death or injury to listed salmonids is not expected due to an increase in suspended solids. (*Id.* at 22-23.)

The pile driving will also create loud underwater sounds. (*Id.*) Fish with swimbladders, like salmonids, are sensitive to underwater impulsive sounds, which can rupture capillaries, causing hemorrhage, rupture of internal organs, and death. (*Id.* at 23.) Listed salmonids are at risk for these biological effects from the high sound pressures produced when piles are driven with an impact hammer. (*Id.*) Using a bubble curtain can create a ninety-percent reduction in sound energy, but some death or injuries to listed salmonids are still likely to occur. (*Id.*) However, vibratory hammers do not reach levels of concern to salmonids even when piles up to seventy-two inches in diameter are driven. (*Id.*) The City expects that a vibratory hammer will be used to drive the piles, however, NMFS analyzed the worst case scenario using an impact hammer. (*Id.*; NMFS A.R. 12.) Based on available scientific data, NMFS determined that sound levels would attenuate below the injury threshold for seventeen-inch pilings driven with an

impact hammer at 1,594 linear feet.[6]  (NMFS A.R. 6-10.)  Thus, "[b]ased on a worst-case

scenario for dispersal of sediments and sound, the action area extends from 1,594 feet upstream

and downstream from the site."  (BiOp 5.)

> 2.  **NEDC's Complaints**

NEDC contends that NMFS acted contrary to its own regulations when it limited the size

of the action area.  First, NMFS failed to determine the sound dispersal for the installation of

twenty-four-inch piles, which are authorized by the permit.  Second, it ignored the fact that

behavioral impacts on fish extend beyond the distance marking the onset of physical injury to

fish.  Third, in a footnote NEDC also argues that the determination that the dock will not increase

boat traffic on the Willamette is irrational.

With regard to the size of the piles, the government argues that the sixteen-inch piles have

already been ordered and the entire project has been designed around them.  NEDC responds that

the project's implementation is not conditioned on the use of sixteen-inch piles, therefore it was

---

[6] A multi-agency work group has set interim thresholds for the onset of sound-induced injuries to fish from pile driving at 187 decibels cumulative source exposure level for fish two grams or larger and 183 decibels for fish smaller than two grams.  (BiOp 23 (citing Fisheries Hydroacoustic Working Group, *Memorandum on the Agreement in Principle for Interim Criteria for Injury to Fish from Pile Driving Activities* (2008), *available at* http://www.wsdot.wa.gov/Environment/Biology/BA/default.htm#Noise (follow "Interim Criteria Agreement" hyperlink) [hereinafter *Interim Criteria Agreement*]).)  NMFS analyzed injury threshold distance at both the 183 and 187 decibel levels.  (NMFS A.R. 6, 7.)  The agency obtained sound level inputs from the California Department of Transportation's Pile Driving Compendium, for fourteen-inch and twenty-inch steel piles (there was no data on sixteen-inch piles).  (NMFS A.R. 9 (citing *Compendium of Pile Driving Sound Data* (Illinworth & Rodkin eds. 2007), *available at* http://www.dot.ca.gov/hq/env/bio/files/pile_driving_snd_comp9_27_07.pdf).)  They split the difference for the two pile sizes, determining that sound levels would attenuate below 183 decibels for seventeen-inch pilings driven with an impact hammer at 1,594 linear feet.  (NMFS A.R. 6-10.)

arbitrary and capricious and contrary to law for NMFS to limit the size of the action area as it did.  Agencies are not required to ignore the reality on the ground when putting together a biological opinion.  It was reasonable for NMFS to rely on information provided by the City regarding purchased materials when preparing its analysis of sound dispersal.  The record indicates that sixteen-inch piles have been purchased, (NMFS A.R. 39 at 3, lines 28-30), therefore the analysis examining the effect of seventeen-inch piles (splitting the difference between fourteen- and twenty-inch piles) was not arbitrary and capricious.

NEDC indicates that the documents in the record used to determine the range of sound wave injury to fish, also contains a column on behavioral effects.  For twenty-inch piles, sound that can affect fish behavior will travel approximately 9,600 feet.  NEDC argues that the action area should have included this area because the regulations require that the action area include all areas affected directly and indirectly by the proposed project.  50 C.F.R. § 402.02.  NMFS acknowledges that the worksheet referred to by NEDC is consistent with the SLOPES III biological opinion, issued in 2004.  However, more recent studies indicate that "available data are currently too sparse to set clear-cut science-based criteria for behavioral disturbance of fish or auditory masking from pile driving."  Arthur N. Popper et al., *Interim Criteria for Injury of Fish Exposed to Pile Driving Operations: A White Paper* 3 (2006), *available at* http://www.wsdot.wa.gov/Environment/Biology/BA/default.htm#Noise (follow "Injury of Fish Exposed to Pile Driving" hyperlink) [hereinafter *Interim Criteria White Paper*].  NMFS is entitled to rely on reasonable opinions of qualified experts, even if there is contrary evidence available.  *Lands Council*, 537 F.3d at 1000.

PAGE 13 - OPINION

NEDC contends that the *Interim Criteria White Paper* is not discussed or cited in the biological opinion for the proposed dock and that it could find no citation to the paper in the record. Thus, the only scientific evidence in the record is that contained in the SLOPES III BiOp, which concludes that sound levels above 150 decibels affect fish behavior. (NMFS A.R. 58 at 76.) NMFS responds that the administrative record includes all documents and materials directly or indirectly considered by the agency. *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citing *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981)). The biological opinion cites the Washington Department of Transportation Website that contains the *Interim Criteria Agreement*, the *Interim Criteria White Paper*, and the California Department of Transportation's pile driving compendium. (BiOp 23.) The agency argues that by directly relying on the thresholds in the *Interim Criteria Agreement*,[7] NMFS indirectly relied on the scientific studies supporting those thresholds from the *Interim Criteria White Paper*. The *Interim Criteria White Paper*, in turn found that there was insufficient information regarding behavioral effects resulting from underwater sound waves. Although the chain is somewhat attenuated, the agency was entitled to rely on the *Interim Criteria White Paper* because the record demonstrates that the study was known to NMFS when it conducted the BiOp. The decision not to consider possible behavioral effects on fish was based on the opinion of a qualified expert and was therefore not arbitrary and capricious.

---

[7] The *Interim Criteria Agreement* itself indicates that no decision was made regarding sub-injurious effects on fish, which were to be discussed at future meetings.

Finally, NEDC argues in a footnote that NMFS provided no rational explanation for its assertion that a new dock facility will not increase boat use of the Willamette. NEDC makes a similar argument under Claim 7, therefore, this complaint will be discussed with Claim 7.

**B.** ***Claim 1: No Jeopardy Finding - Problem of Predation***

At the conclusion of a formal consultation, NMFS must determine whether a project will "jeopardize the continued existence of" any listed species. 16 U.S.C. § 1536(a)(4), (b); 50 C.F.R. § 402.14(h). An action jeopardizes the continued existence of a listed species if it "would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. In doing so, NMFS must consider "the effects of the action and cumulative effects on the listed species." *Id.* § 402.14(g)(3).

The biological opinion concludes that there will be no increase of predation on juvenile listed salmonids in the action area as a result of the proposed dock. (BiOp 24.) In Claim 1, NEDC argues that NMFS's decision is unreasonable because the BiOp does not address the fact that the boats tied to the dock will increase shade under the dock, making the area more attractive to predators. The portion of the current barge dock that will be removed covers approximately 2,400 square feet and is not used by boats. (*Id.* at 2.) It will be replaced by the new dock with space to tie up seventeen boats greater than twenty-six feet in length, for a total of approximately 6,120 square feet of covered area (with seventeen boats). (*Id.* at 32.)

NEDC further argues that the BiOp and ITS are inconsistent and thus irrational. The BiOp does not analyze the predator habitat created by docked boats, concluding that because the new structure is smaller than the old structure, there will not be an increase in predation. (BiOp

24.)  The ITS on the other hand, defines the take allowed for this project, as take resulting from all 6,120 square feet of area covered by the dock and docked boats.  (BiOp 32.)

NMFS's finding of no jeopardy was not arbitrary and capricious or irrational.  First, although predation is a concern for listed salmonids generally, a study cited throughout the BiOp states that predation is not a significant concern on the lower Willamette.  (NMFS A.R. 80 at 10.)  Based on four years of data collected from radio-tagging and tracking predatory piscivorous fish, the authors "observed very little evidence of predation on juvenile salmonids . . . [and determined] that densities of all large predator fishes are low, and their effects on juvenile salmonids are likely negligible."  (*Id.*)

Furthermore, NEDC has little support for its contention that boats temporarily tied to docks create especially suitable predator habitat.  The record indicates that "predator abundance in the lower Willamette River is primarily affected by current velocity, water depth, and proximity to shore."  (NMFS A.R. 16 at 52.)  Predatory fish tend to remain close to shore and are often found around pilings and rocky banks.  (NMFS A.R. 80 at 10.)  In light of this information, NMFS's conclusion that the project will not increase predation is rational.  The project calls for the removal of thirty-two pilings, with only twelve being placed for the new dock.  (BiOp 2.)  The new dock covers less surface than the old dock and will be equipped with one foot of grating every six feet, to allow light penetration under the dock.  (*Id.*)  Anti-perching devices will also be installed to reduce avian predation.  (*Id.*)  Boating activity is higher in the summer, when few listed salmonids are expected to be in the action area.  (*Id.* at 25.)  Thus, even if the increased shade results in a corresponding increase in predation, the increase would occur when the fewest number of listed salmonids were present in the river.  Perhaps most importantly, the new dock

PAGE 16 - OPINION

will be located farther offshore, in deeper water, with faster currents, making the area less

attractive to predator fish.  (*Id.* at 21, 29.)  The location also moves the structure outside the

preferred habitat of juvenile salmonids.  (*Id.* at 29.)  Finally, NMFS states that it did consider the

possibility that boats tied to the dock could contribute to predation in the ITS and determined that

the potential take of listed salmonids would be acceptable under the ESA.  (*Id.* at 32.)

NMFS properly considered the potential dangers resulting from avian and fish predation

on listed salmonids.  The record demonstrates that the new dock is likely less attractive to

predators than the existing barge dock.  The ITS's recognition that increased shade could result in

increased predation does not contradict the evidence in the BiOp that predation is not a

significant problem for salmonids in the Willamette.  It merely demonstrates that NMFS

considered the possible impact of additional shade as one element in the predation calculus.  This

is an acceptable method of analysis for NMFS when preparing a biological opinion.

C.    *Claim 4: Impacts on Designated Critical Habitat*

In 2005, NMFS designated the Lower Willamette/Columbia River Corridor critical

habitat for the threatened LCR and UWR Chinook salmon and steelhead.  Endangered and

Threatened Species, 70 Fed. Reg. 52,630 (Sept. 2, 2005) (to be codified at 50 C.F.R. pt. 226).

The critical habitat includes the area of the proposed dock.  Tryon Creek is designated critical

habitat for LCR steelhead.  50 C.F.R. § 226.212(s)(8)(i).

A BiOp must detail how an agency action impacts critical habitat and whether those

impacts are likely to constitute destruction or adverse modification of that habitat.  *See* 16 U.S.C.

§ 1536(b)(3)(A).  In doing so, NMFS must consider "the effects of the action and cumulative

effects on . . . critical habitat."  50 C.F.R. § 402.14(g)(3).  The effects of the action include the

direct and indirect effects, together with the effects of other activities that are interrelated or

interdependent with the action, "that will be added to the environmental baseline." *Id.* § 402.02.

NMFS focuses on the effects of the action on the PCEs and evaluates whether, following

the action, "critical habitat will remain functional and retain the current ability for PCEs to

become functionally established, to serve the intended conservation role for the species." (BiOp

30.)  Adverse modification determinations are made in the context of the critical habitat as a

whole.  Adverse effects on "constituent elements or segments of critical habitat generally do not

result in . . . adverse modification determinations unless that loss, when added to the

environmental baseline, is likely to . . . appreciably diminish the capability of the critical habitat

to satisfy essential requirements of the species." *Section 7 Handbook*, at 4-34.  To "appreciably

diminish the value" means to "considerably reduce the capability of designated or proposed

critical habitat to satisfy requirements essential to both the survival and recovery of a listed

species." *Id.*

### 1.    Examination of Primary Constituent Elements of Habitat

Listed salmonids use the action area for migration and rearing; there is no known

spawning activity in the action area.  (BiOp 11; NMFS A.R. 16 at 51, 56, 60.)  The PCEs for

rearing and migratory habitat of listed salmonids include water quantity and quality, flood plain

connectivity, forage, natural cover, and free passage.  (BiOp 19; *see also* 50 C.F.R.

§ 226.212(c)(3).)  NMFS found that the proposed dock would have no effect on water quantity,

flood plain connectivity, or natural cover.  (BiOp 27.)  The action would "cause minor, localized

degradation of . . . water quality and forage" during construction.  (*Id.*)  NMFS also noted that

"[m]ost of the year, nearshore access [for salmonids] will be increased by locating the new dock

farther offshore.  However, during the summer months when few ESA-listed species are present, boating traffic in nearshore areas is increased due to usage of the west side of the dock."  (*Id.*)

Based on the above, NMFS determined the dock "will not result in the destruction or adverse modification of designated critical habitat."  (*Id.* at 28.)  Although dock construction is expected to "cause a minor reduction in the conservation value of critical habitat PCEs for the rearing and migration corridor within the action area, [the effects] are too small and brief to affect the conservation value of the Willamette River, or critical habitat as a whole."  (*Id.* at 30.)

### 2.    NEDC's Complaints

NEDC contends that this conclusion is arbitrary and capricious for two reasons.  First, NMFS did not analyze the project's impact on Tryon Creek, which is located 700 feet downstream from the new dock.  NEDC argues that Tryon Creek's importance is clear because the Corps considered a location for the dock closer to the mouth of Tryon Creek, which was rejected to minimize impacts on the creek.  (USACE A.R. 72.)  Second, NMFS's determination that the additional environmental impact of the dock is "small" is insufficient to support the conclusion that the project will not destroy or adversely modify critical habitat considering the terrible state of fish habitat in the Willamette.  According to the draft biological assessment, "[f]urther degradation of [the environmental baseline] conditions may have a significant negative impact on listed [salmonids] due to the risk presently faced under the environmental baseline."  (NMFS A.R. 16 at 47.)  Thus, NMFS should have determined whether the habitat can withstand additional adverse impacts, however small.

NMFS properly considered the effect of the proposed dock on the PCEs of salmonid rearing and migratory habitat.  In so doing, the agency necessarily considered the effect on all

salmonids migrating through the action area, including those migrating to Tryon Creek.  Outside the few weeks of construction, which will add sediment to the river causing a drop in water quality and foraging ability, the only expected effect of the dock is delay in nearshore passage during the peak boating season of the summer months.  (BiOp 27.)  NEDC does not challenge this finding.  Nor does NEDC disagree that there are fewer listed salmonids present during the summer months or that moving the dock further from shore will actually benefit salmonids migrating and rearing during the winter months when the dock sees less use.

As to the dock's impact on the general state of fish habitat in the Willamette, NMFS's determination of no adverse modification is supported by scientific studies analyzing the migratory behavior, timing, rearing, and habitat use of juvenile salmonids in the lower Willamette.  The 2005 Friesen study, although noting that further study was required as to subyearling fish, "found little evidence to suggest that nearshore habitat as it currently exists is a critical factor affecting yearling salmonids."  (NMFS  A.R. 80 at 9, 117.)  Similarly, the Ward study published in 2004, concluded that "waterway developments presented few risks to migrating juvenile salmonids."  (NMFS A.R. 112 at 1; *see also id.* at 8-9.)  NEDC cites no contrary scientific evidence and does not explain how an analysis of salmonid rearing and migration PCEs in the action area would not apply to the same behavior in Tryon Creek.

NMFS also properly considered the effect of the proposed dock on the environmental baseline and did not simply dismiss it as small.  Rather, the agency determined that there was no effect on several essential PCEs and that others would be affected for only a few weeks during a time when few fish were in the area.  (BiOp 27.)  Finally, NMFS determined that nearshore passage would be negatively affected by boat traffic during the summer months, but again noted

that few fish were in the area during that time, and that passage would be positively affected during the remainder of the year, when the fish population is at its peak.  (*Id.*)  These decisions are within the agency's area of expertise and were based on scientific evidence and are therefore entitled to deference.  *Lands Council*, 537 F.3d at 988, 993.

    **D.**    ***The Incidental Take Statement ("ITS")***

Section 9 of the ESA prohibits the "take" of listed species.  16 U.S.C. § 1538(1)(B).  Take is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  When NMFS issues a "no jeopardy" opinion, it must include an ITS specifying the amount or extent of take expected to occur, reasonable and prudent measures to minimize the impact of the take, and mandatory terms and conditions to implement the reasonable and prudent measures.  *Id.* § 1536(b)(4).  The ITS provides an exception to Section 9's take prohibition; any take in compliance with the terms and conditions of a valid ITS is not unlawful.  *Id.* § 1536(o)(2).  If the amount or extent of take specified in the ITS is exceeded during the project, Section 7 consultation must be reinitiated.  50 C.F.R. § 402.16(a).

The level of authorized incidental take must be consistent with ensuring against jeopardy. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1) (level of incidental take cannot violate Section 7 prohibitions).  In other words, for an ITS to be lawful, NMFS must conclude that the effects of the action, when added to the environmental baseline, will not jeopardize the continued existence of the listed species.  50 C.F.R. § 402.14(g)(2)-(4); *see also id.* § 402.02 (defining incidental take as "takings that result from . . . carrying out an *otherwise lawful activity*") (emphasis added).  The environmental baseline includes the past and present impacts of all activities and cumulative effects in the action area.  *Id.* § 402.02; *see also Section 7 Handbook*, at 4-35 ("In determining

whether an action is likely to jeopardize the continued existence of a species, the action is viewed against the aggregate effects of everything that has led to the species' current status.").  Thus, NMFS must determine the impacts currently affecting the listed species, then determine whether take from the proposed action, on top of the current level of take, will result in jeopardy to the listed species.  *See Section 7 Handbook*, at 4-35 ("The final analysis then looks at whether, given the aggregate effects, the species can be expected to both survive and recover" in light of the additional impacts of the proposed project.)  "[A] jeopardy opinion is rendered when the total of the species' status, environmental baseline, effects of the proposed action, and cumulative effects lead to the conclusion that the proposed action is likely to jeopardize the continued existence of the *entire* species . . . as listed." *Id.* at 4-36.

The BiOp indicates that NMFS does not expect any adult salmonids to be taken.  (BiOp 32.)  The agency determined that take of juvenile salmonids could not be accurately quantified as a number of fish because the precise distribution and abundance of juvenile fish in the action area is subject to "wide, random variations due to biological and environmental processes operating at much larger demographic and regional scales" and "are not a simple function of the quantity, quality, or availability of predictable habitat resources within [the] area." (*Id.*)  Thus, NMFS issued the following ITS:

> The area of aquatic habitat to be covered by the floating concrete dock, gangway, connectors, support floats (i.e., 2,936 square feet), plus the area of 17 boats tied up at the facility (i.e., 6,120 square feet) and 3,600 pile strikes per day with an impact hammer . . . .  Exceeding any of these limits will trigger the reinitiation provisions of this Opinion.

(*Id.*)

### 1.    Claims 3 & 6: Failure to Determine Current Take Level

PAGE 22 - OPINION

NEDC compares the jeopardy and take determinations to a bank account; each new project and ITS is a withdrawal from the species' account.  Thus, NMFS must know the current balance of the account and the amount of the withdrawal to ensure that a new project does not overdraw the account.  Here, NEDC argues that NMFS knows neither.  No attempt is made to analyze or quantify the level of take stemming from existing structures in and along the Willamette.  NEDC notes that at least 142 structures have been allowed since the species' listing in 1999, (BiOp 18), yet no attempt was made to determine the amount of take that has resulted from those structures.  It contends no accurate understanding of potential jeopardy can be made without this information.  *See Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 (D.D.C. 2001) ("The impact of an authorized incidental take cannot be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other incidental take authorized by [the agency]."); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008) ("It is only logical to require that the agency know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from 'significant' impairments to habitat that is already severely degraded.").

NEDC acknowledges that a numerical accounting of take of listed salmonids in the Willamette is likely impossible, and suggests that NMFS use a numerical level of habitat disturbance as a surrogate measure.  Thus, NMFS could add up the aquatic area covered or affected by the 142 structures permitted since 2000, as a proxy for the current level of take.

NMFS completed a thorough analysis of the status of affected salmonids using criteria that describe a viable salmonid population ("VSP").  (BiOp 7-8.)  Attributes associated with a VSP include abundance, productivity, spatial structure, and genetic diversity.  (*Id.* at 8.)  NMFS

reviewed the current condition of each of the five listed salmonids using these criteria. (*Id.* at 8-11.) The BiOp also contains a thorough assessment of the past and present activities impacting salmonid habitat and the status of critical habitat in the Willamette and Lower Columbia River Recovery Domain, focusing on the conditions and trends affecting the PCEs. (*Id.* at 14-19.) The agency then turned to the action area itself, determining that the area serves as a migration corridor for adult and juvenile salmonids, as well as a rearing site for juveniles. (*Id.* at 13.) The environmental baseline of the action area was discussed, describing the degraded habitat conditions and the existing docks and structures in the area. (*Id.* at 1, 5 (Figure 2), 20-21, 29.) After this analysis, NMFS determined that the proposed action did not contribute to the major factors limiting the species' ability to recover or create a new factor that could limit their recovery. (*Id.* at 28-30.)

> [I]t is likely that the net effect of the proposed action will be a very small and temporary reduction in the number of juvenile fish from ESA-listed species in the action area, far too few to significantly reduce adult returns, and thus too few to affect the abundance or productivity of any affected population or to appreciably reduce the likelihood of survival and recovery of any listed species.

(*Id.* at 30.) Thus, NMFS determined there would be no effect on the VSP.

NMFS contends that the checkbook approach suggested by NEDC is improper. First, a "[f]ocus on actual species count is an overly narrow interpretation of what is required under the jeopardy [analysis]." *Gifford Pinchot Task Force v. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067 (9th Cir. 2004). The ability of listed salmonids to survive and recover is best assessed in terms of the VSP criteria and the extent to which the proposed action will contribute to the major factors limiting the species' ability to survive and recover. Second, NMFS argues that it is impossible to numerically quantify the current level of take due to human effects on the Willamette. Thus, a

PAGE 24 - OPINION

surrogate must be used to estimate take.  Finally, NMFS points out that NEDC does not explain

how adding up the total square footage of docks on the Willamette would help to assess whether

a particular federal project will appreciably reduce a listed salmonid's ability to survive and

recover.

"[T]he ESA does not prescribe how the jeopardy prong is to be determined."  *Gifford*

*Pinchot*, 378 F.3d at 1067.  NMFS acted reasonably in this case.  Current levels of take cannot be

categorized numerically and the VSP are an appropriate scientifically based proxy.  Based on the

abundant information in the BiOp about the current state of each of the listed species and the

state of the critical habitat, NMFS knows "roughly at what point survival and recovery will be

placed at risk."  *Nat'l Wildlife Fed'n*, 524 F.3d at 936.  Thus, NMFS's determination of no

jeopardy was not arbitrary and capricious due to a failure to account for the current level of take

in the Willamette.

2.      **Claim 6: Failure to Impose Limit on Take and Create Trigger for New**
        **Consultation**

NEDC also contends that the ITS is invalid because NMFS failed to place any real limit

on the amount of take authorized and fails to set the required trigger for reinitiation of section 7

consultation.  "In general, Incidental Take Statements set forth a 'trigger' that, when reached,

results in an unacceptable level of incidental take, invalidating the safe harbor provision, and

requiring the parties to re-initiate consultation.  Ideally, this 'trigger' should be a specific

number."  *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1249 (9th Cir.

2001) (citations omitted).  "A surrogate is permissible if no number may be practically obtained,"

but the surrogate "must be able to perform the functions of a numerical limitation."  *Or. Natural*

*Res. Council v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007). Whether or not there is a numerical trigger, an ITS must "contain measurable guidelines to determine when incidental take would be exceeded." *Id.* (citing *Ariz. Cattle Growers'*, 273 F.3d at 1249-51). When a non-numerical surrogate is used, "the surrogate must not be so general that the applicant or the action agency cannot gauge its level of compliance." *Id.* at 1039 (citing *Ariz. Cattle Growers'*, 273 F.3d at 1250-51). The surrogate must also be "linked to the take of the protected species." *Id.* at 1038 (citing *Ariz. Cattle Growers'*, 273 F.3d at 1250).

In *Oregon Natural Resources Council*, the court found that the Fish & Wildlife Service's ("FWS") ITS was arbitrary and capricious. *Id.* at 1037. The ITS was "all spotted owls associated with the removal and downgrading of 22,227 acres of suitable spotted owl habitat." *Id.* at 1038. First, the court declared the ITS invalid because it did not "explain why it was impracticable to express a numerical measure of take." *Id.* at 1037. The court then continued its analysis of the ITS, noting that even if the take was higher than expected, the ITS would not permit the agency to stop the project and reinitiate consultation. *Id.* at 1038. "Instead, the permissible level of take is coextensive with the project's own scope. The [ITS] and BiOp are rendered tautological, they both define and limit the level of take using the parameters of the project." *Id.* at 1039. The court found this to be improper in this case because the trigger function was lost. Although a surrogate method, such as habitat, may be used to determine a project's impact on a listed species, "it cannot be so indeterminate as to prevent the Take Statement from contributing to the monitoring of incidental take by eliminating its trigger function." *Id.* at 1041. Rather, the chosen surrogate "must be able to perform the functions of a numerical limitation." *Id.* at 1038.

PAGE 26 - OPINION

The result in *Oregon Natural Resources Council* can be explained solely in reference to the court's holding that FWS failed to establish that it could not set a numerical measure of take. But if read as a limitation on surrogate measures of take, the Ninth Circuit has created a quandary for district courts. The court recognizes that numerical limits on take are not always possible, but requires that the surrogates for take perform essentially the same functions as numerical limitations. But surrogates, by definition, provide an estimate of take based on expected consequences of actions taken by an agency. Thus, most surrogates will define take in a manner "coextensive with the project's [expected] scope." With almost any surrogate, like the one use here, the expected consequences of the project will not trigger reinitiated consultation. That fact alone should not render them defective.[8]

Other district courts have struggled with this issue. In *Swan View Coalition v. Barbouletos*, the district court for the District of Montana examined an ITS that used the "surrogate measures of road density and security core habitat" to measure take of grizzly bears. No. CV 05-64-M-DWM, 2008 WL 5682092, at *11 (D. Mont. Mar. 31, 2008). The court found that the deadlines for attainment of road density and core habitat standards were adequate triggers for consultation. *Id.* at *14. The court distinguished *Oregon Natural Resources Council*, stating first, that in the *Swan View* case there were circumstances under which the project would exceed the approved level of take. *Id.* Second, unlike in *Oregon Natural Resources Council*, the project at issue would improve habitat conditions for grizzly bears over the current situation. *Id.* Third, the ITS contained detailed terms and conditions limiting activities during certain seasons and

---

[8] One unexpected consequence that remains a possible trigger under these circumstances is the identifiable death or injury of a listed animal, which may be listed as a separate trigger in the ITS, as was done in this case. (BiOp 35-36.)

requiring regular reports from the Forest Service. *Id.* Finally, the court noted that reinitiation of consultation is required when new information "reveal[s] effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." *Id.* (quoting 50 C.F.R. § 402.16(b)). Together, these elements gave the court confidence that the agency would reinitiate consultation should human-caused grizzly bear mortalities occur in the relevant area.

Similarly, in *Natural Resources Defense Council, Inc. v. Gutierrez*, the court found that a surrogate of the detection of a harmed, injured, or killed sea turtles was appropriate at the preliminary injunction stage. No. C-07-04771, 2008 WL 360852, at *29 (N.D. Cal. Feb. 6, 2008). The court noted that the ITS was not "as broad as the parameters of the project" as was the case in *Oregon Natural Resources Council*. *Id.* Although the court was concerned that this trigger was illusory because of the difficulty of detecting harm to small animals like sea turtles, it noted that the plaintiffs had not been able to indicate a practical alternative. *Id.*

NEDC argues that the ITS in this case is similar to that in *Oregon Natural Resources Council*, because it equals any take associated with the expected scope of the project. (BiOp 32.) Unlike *Oregon Natural Resources Council*, NMFS properly determined that a surrogate was required because the take expected from the project cannot be quantified numerically. (*Id.* at 30, 32.) The two ecological conditions associated with the project are the sound and sediment created by the piling work and the structure and surface area created by the dock and boats tied to it. (*Id.* at 32.) Therefore, NMFS quantified take in terms of those ecological conditions. The agency addressed the causal relationship between the conditions and take, explaining that pile

driving noise will extend about 1,594 feet from each pile and take due to predation will occur immediately adjacent to the structure. (*Id.*)

This case can be further distinguished from *Oregon Natural Resources Council*. The scope of the ITS is not simply the maximum scope of the project. Reinitiation of consultation is triggered by more than 3,600 pile strikes in a day or more than 6,120 square feet of water being covered at the dock (i.e., more than seventeen boats tie up at the dock), both of which could occur without expanding the project. (*Id.* at 31-32.) The ITS also requires the Corps to monitor the construction and use of the dock, as was the case in *Swan View Coalition*. (*Id.* at 33.) In particular, a notice must be posted at the work site requiring that NMFS be notified if "a sick, injured or dead specimen of a threatened or endangered species is found in the project area." (*Id.* at 35.) Furthermore, it is possible or even likely that the new dock will actually improve conditions for listed salmonid by reducing predation, as was the case in *Swan View Coalition*. Predators prefer shade, pilings, and slower water, all of which are amply available under the existing barge dock. (NMFS A.R. 16 at 52; *id.* 80 at 10.) This project calls for the removal of a net twenty piles, reduces the total surface area of the dock (although increasing the number of docked boats) while adding grating to reduce shade, and is in deeper, faster water that is less attractive to both predators and juvenile salmonids. (BiOp 2, 21, 29.) Finally, the surrogate of area covered is the very surrogate suggested by NEDC for the measure of current take. *Supra* Section I.D.1. Therefore, I hold that the use of pile strikes and covered area is a proper surrogate in this case and NMFS's actions were not arbitrary and capricious or contrary to law.

//

//

PAGE 29 - OPINION

II.    **Claim 5: Rivers and Harbors Act ("RHA")**

The RHA provides that it is unlawful to build a structure in any navigable river or other

water of the United States "except on plans recommended by the Chief of Engineers and

authorized by the Secretary of the Army."  33 U.S.C. § 403.  "The decision whether to issue a

permit will be based on an evaluation of the probable impacts, including cumulative impacts, of

the proposed activity and its intended use on the public interest."  33 C.F.R. § 320.4(a)(1).  This

review requires a "careful weighing" of relevant factors; "[t]he benefits which reasonably may be

expected to accrue from the proposal must be balanced against its reasonably foreseeable

detriments."  *Id.*  The "decision should reflect the national concern for both protection and

utilization of important resources."  *Id.*

There are a non-exhaustive list of factors that may be relevant to the required balancing in

a variety of situations and three "general criteria" that must be considered.  *Id.* § 320.4(a)(1)-(2).

The general criteria are: (1) the public and private need for the proposed structure; (2) where

there are conflicts about resource use, the practicability of using alternative locations and

methods; and (3) "[t]he extent and permanence of the beneficial and/or detrimental effects which

the proposed structure or work is likely to have on the public and private uses to which the area is

suited."  *Id.* § 320.4(a)(2).  The specific weight to be given to each factor is "determined by its

importance and relevance to the particular proposal."  *Id.* § 320.4(a)(3).  "[F]ull consideration and

appropriate weight" must also be given to all comments, including those from other agencies and

experts.  *Id.*  "[A] permit will be granted unless the district engineer determines that it would be

contrary to the public interest."  *Id.* § 320.4(a)(1).

A court's review of the Corps' public interest determination is limited; courts consider whether the Corps "followed required procedures, evaluated relevant factors and reached a reasoned decision." *Van Abbema v. Fornell*, 807 F.2d 633, 636 (7th Cir. 1986). However, courts must ensure that the agency took the requisite "hard look" at the environmental factors implicated, *id.* (citations omitted), and "the Corps' conclusions must find some reasonable support in the record," *id.* at 639 (citations omitted).

NEDC contends that the Corps' public interest review here is arbitrary and capricious because it fails to evaluate the "relevant extent of the public and private need for the proposed structure." 33 C.F.R. § 320.4(a)(2)(i). Specifically, NEDC argues that the "purpose and need" section of the EA contains no explanation for why the City needs a docking facility for vessels greater than twenty-six feet in length. (USACE A.R. 64.) NEDC also argues that the Corps failed to perform the required balancing, merely stating that "after weighing the factors described in the EA, I find that issuance . . . of the Army permit . . . is not contrary to the public interest." (*Id.* at 80.)

A.    ***The Corps' Determination of Public and Private Need***

The Corps responds that its determination that there was a public and private need for the dock has a rational basis in the record. Specifically, the Corps found that a number of needs would go unmet under the "no action" alternative: there would be no access to Foothills Park and downtown Lake Oswego for boaters, there would be no safe pedestrian access to the shore by boat, and soon the current dock would be considered unsafe for pedestrian access to the water from shore. (*Id.* at 71-72.) The Corps also argues that it took needs into account in determining the size, (*id.* at 68), location, (*id.* at 72-73), and design, (*id.* at 69), of the dock.

PAGE 31 - OPINION

In making public interest determinations the Corps may rely on the expertise of other government agencies, *Crutchfield v. County of Hanover*, 325 F.3d 211, 224 (4th Cir. 2003), and need not perform an independent evaluation of the need for a project, *Friends of the Earth v. Hintz*, 800 F.2d 822, 834-36 (9th Cir. 1986) (Corps need not conduct independent studies and may base its analysis "entirely upon information supplied by the applicant.").  Here, the Corps argues that its consideration of need is supported by OSMB's EA, OSMB's 2005-2011 Six-year Statewide Boating Facilities Plan, the City's East End Redevelopment Plan, Comprehensive Plan, and Park and Recreation Coordination Plan, and by Clackamas County's plan.  Only the OSMB's EA is in the record; it states:

> Transient tie-up docks provide essential short-term moorage and safe harbor for large recreation boats . . . [t]emporary moorage space for these non-trailerable recreational boats is lacking on the Willamette River in the Lake Oswego area . . . A dock at this location would provide safe, ADA accessible transient moorage . . . [and] access to upland amenities and recreational opportunities at Lake Oswego. The lack of transient tie-up space on the City's waterfront makes it difficult for boaters to access onshore toilet facilities and may contribute to improper waste disposal and degraded water quality.  A new ADA accessible transient dock is required to protect public health and safety, preserve water quality and to meet the current access needs for recreational boaters.

(USACE A.R. 316.)  "The facility will also provide nature viewing opportunities to pedestrians accessing the river from the downtown area."  (*Id.* at 319.)  These conclusions are based on the plans and studies listed above.  (*Id.* at 316, 319, 334.)  The Corps was entitled to rely on the OSMB's EA and the plans and studies to which it cites.  Although the Corps' rationale is not perfectly clear, the presence of the OSMB's EA in the record is sufficient to meet the standards set by the Supreme Court for APA review.  *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (courts "will uphold a decision of less than ideal clarity if the

agency's path may reasonably be discerned" (citation omitted)).  Therefore, the Corps'

determination of public and private need was not arbitrary and capricious.

**B.**    ***The Corps' Balancing of Benefits and Detriments***

The Corps contends that it properly considered the beneficial and detrimental impacts of

the dock on thirty-two public interest/environmental factors.  (USACE A.R. 73-77.)  Many of the

factors discussed did not need to be balanced because the Corps determined that the project

would have no impact on them.  (*See id.* at 73-74.)  NEDC does not challenge the "no impact"

determinations.  The Corps further argues that its balancing is demonstrated by the response to

public and government comments, (*id.* at 65-70), alternatives analysis, (*id.* at 71-73),

Environmental Impact Assessment, (*id.* at 73-77), and adoption of special conditions to minimize

the impact of the project, (*id.* at 78-79).  The Corps also balanced the interests of different groups

like fishermen, water skiers, and nearby property owners.  (*Id.* at 75.)

The Corps' EA establishes that the required balancing of benefits and detriments

occurred.  The EA amply demonstrates that the Corps considered the interests of a wide variety

of groups and discussed the impact of the project on a multitude of environmental factors.  In

particular, the placement of the new dock is specifically tied to the balancing of the

countervailing interests of fish and human traffic in the river and the requirement of using a

vibratory hammer to the extent practicable demonstrates the wish to minimize hydroacoustic

damage to fish while ensuring that the dock is built to meet the public and private need.  The fact

that the closing paragraph of the EA does not reexamine the balancing process does not mean

that it did not occur.  Therefore, I hold that the Corps properly balanced "[t]he benefits which

reasonably may be expected to accrue from the proposal . . . against its reasonably foreseeable

detriments."  33 C.F.R. § 320.4(a)(1).

III.    **Claim 7: National Environmental Policy Act ("NEPA")**

NEPA requires that federal agencies adequately assess the impact of federal actions

"significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C); *Ctr. for*

*Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir.

2008).  NEPA's purpose is twofold: (1) ensure that agencies carefully consider information about

significant environmental impacts and (2) guarantee relevant information is available to the

public.  *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for*

*Biological Diversity*, 538 F.3d at 1185.  This is a procedural requirement imposed on federal

agencies to "take[] a 'hard look' at the potential environmental consequences of the proposed

action."  *Or. Natural Res. Council v. U.S. Bureau of Land Mgmt.*, 470 F.3d 818, 820 (9th Cir.

2006) (quoting *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993).  "Judicial review of agency

decision-making under NEPA is limited to the question of whether the agency took a 'hard look'

at the proposed action as required by a strict reading of NEPA's procedural requirements."

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938,

947 (9th Cir. 2008) (citing *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001).

Under NEPA, if the applicable regulations do not categorically require the preparation of

an EIS, then an agency prepares an EA.  *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir.

2000).  The EA "[s]hall include brief discussions of the need for the proposal, of alternatives . . .

[and] of the environmental impacts of the proposed action and alternatives."  40 C.F.R. §

1508.9(b). The purpose of the EA is to provide "sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Id.* § 1508.9(a)(1).

"If there is a substantial question whether an action 'may have a significant effect' on the environment, then the agency must prepare an [EIS]." *Ctr. for Biological Diversity*, 538 F.3d at 1185 (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)). The agency must "undertake a thorough environmental analysis before concluding that no significant environmental impact exists." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (quoting *Blue Mountains Biodiversity*, 161 F.3d at 1216).

NEDC argues that the Corps violated NEPA by issuing an inadequate EA, which resulted in an arbitrary and unsupported FONSI. First, the cumulative impact analysis ignores past actions by improperly limiting the scope of the analysis and failing to establish a baseline. Second, the cumulative impact analysis underestimates the cumulative impact of the proposed dock by relying on the flawed BiOp. Third, the cumulative impact analysis ignores foreseeable future impacts by assuming the dock will not induce additional boating. Fourth, the Corps failed to address other significance factors.

A.    ***Cumulative Impact Analysis***

Determining whether an action will have a significant effect on the environment requires the agency to consider both "context" and "intensity." 40 C.F.R. § 1508.27; *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001). One of the factors for evaluating intensity is cumulative impacts. A cumulative impact is defined as:

> [T]he impact on the environment which results from the incremental impact of the
> action when added to other past, present, and reasonably foreseeable future
> actions regardless of what agency (Federal or non-Federal) or person undertakes

PAGE 35 - OPINION

such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

A cumulative impact analysis, "must be more than perfunctory; it must provide a 'useful analysis of the cumulative impacts of past, present, and future projects.'" *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999)).  To be useful to decision-makers and the public, the cumulative impact analysis must include "some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir. 1998)).

> The scope of the cumulative impact analysis is related to the magnitude of the environmental impacts of the proposed action. Proposed actions of limited scope typically do not require as comprehensive an assessment of cumulative impacts as proposed actions that have significant environmental impacts over a large area. Proposed actions that are typically finalized with a finding of no significant impact usually involve only a limited cumulative impact assessment to confirm that the effects of the proposed action do not reach a point of significant environmental impacts.

Memorandum from James L. Connaughton, Chairman, Council on Envtl. Quality, *Guidance on Consideration of Past Actions in Cumulative Effects Analysis*, to the Heads of Fed. Agencies 3 (June 24, 2005), *available at* http://ceq.hss.doe.gov/nepa/regs/guidance_on_ce.pdf [hereinafter *CEQ Guidance Memorandum*].

Further, as *Lands Council* recently instructed, "we are not free to impose on the agency our own notion of which procedures are best . . . .  Nor may we impose procedural requirements

PAGE 36 - OPINION

not explicitly enumerated in the pertinent statutes." 537 F.3d at 993 (citations and internal

quotation marks omitted). The Corps is not required "to conduct any particular test or to use any

particular method, so long as 'the evidence . . . provided to support [its] conclusions, along with

other materials in the record,' ensure that the agency 'made no clear error of judgment that would

render its action arbitrary and capricious." *League of Wilderness Defenders-Blue Mountains*

*Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008) (quoting *Lands*

*Council*, 537 F.3d at 993). While the agency is required to determine the cumulative effect of the

proposed project combined with other actions, it is neither NEDC's nor this court's role to dictate

the best procedure for determining those effects. Categorically requiring the agency to discuss in

detail every aspect of all previous actions, regardless of their current impact on the area, would

impose a requirement not mandated by statute.

### 1.      Scope of Analysis and Necessity of Determining Baseline

NEDC first challenges the Corps' choice to limit its cumulative impact analysis to the

Portland area, noting that NMFS suggested that the Corps analyze the cumulative effects of

docks and boating, including "the number of public and private docks, launches, marinas and

upland storage facilities, the types of boating activities and the seasonality of the usage, and the

likely cumulative effects of the activity on the recovery of salmonid populations" within the

Lower Willamette River below Willamette Falls. (BiOp 31.) NEPA does not explicitly require

any particular area to be considered for the cumulative impact analysis. Courts have consistently

held that an agency's choice of analysis area requires agency expertise and is entitled to

deference. *Kleppe*, 427 U.S. at 414; *Neighbors of Cuddy Mountain*, 303 F.3d at 1071. I

therefore hold that the Corps' choice of analysis area is adequate under NEPA.

NEDC also contends that the Corps improperly limited the scope of the cumulative

impact analysis by analyzing only "transient facilities that are similar in nature and impact" to the

dock at issue.  (USACE A.R. 77.)  This limitation reduced the number of docks and other

structures on the Willamette that the Corps considered from as many as 1,500 to only seven.  (*Id.*

at 31, 77.)  NEDC argues that there is no legal basis for limiting the scope of review in this

manner, because the effects of a commercial dock, or a non-transient dock, would be similar in

type, if not in total impact, to the effects of a transient dock.  Duration of moorage and type of

boat moored are not factors that differentiate the types of effects docks have on salmonids.

Furthermore, the Corps omitted a baseline or aggregated analysis.  NEDC states that the Corps

has never performed an assessment of the cumulative impacts of the projects it has authorized on

the Lower Willamette.

In considering cumulative impacts, an agency must consider the "present effects of past

actions that are, in the judgment of the agency, relevant and useful because they have a

significant cause-and-effect relationship with the direct and indirect effects of the proposal for

agency action and its alternatives."  *CEQ Guidance Memorandum*, at 3.  Courts have drawn a

distinction between past actions that have similar and different *types* of effects on the

environment, rather than distinguishing between varying levels of impact, in determining what

effects are relevant and useful under the circumstances.  *See Nw. Envtl. Advocates v. Nat'l*

*Marine Fisheries Serv.*, 460 F.3d 1125, 1140 (9th Cir. 2006) ("Because the [agency] concludes

that the channel deepening project will have virtually no effect on salinity, detailed cataloguing

of past projects' impact on salinity would not have informed analysis about alternatives presented

for the current project, and was unnecessary." (internal citation omitted)).  In *Northwest*

PAGE 38 - OPINION

*Environmental Advocates*, the court found that the agency need not discuss past projects that impacted salinity because the proposed project would have no effect on salinity. *Id.* In contrast, in *Klamath-Siskiyou Wildlands Center*, the Ninth Circuit indicated that the cumulative effects analysis was insufficient in part because it was unclear why the BLM had chosen to consider a project in another watershed but had failed to consider several projects in the watershed at issue. 387 F.3d at 995. In other words, because the agency had not made clear how they were distinguishing between the projects the court required further analysis.

If the Corps' cumulative impact analysis was limited solely to seven transient docks, NEDC's argument would have substantial merit. The record indicates that docks themselves, without considering ramps or duration of boat moorage, have at least two effects on salmonids: the structure of a dock shelters and attracts predators and docks tend to increase boat traffic in the immediate area, which can interfere with juvenile salmonid migration and rearing. When it comes to sheltering predators, a non-transient dock would have the same type of effect on salmonids as a transient dock. Similarly, a dock that increases general boat traffic would not have a different type of effect on salmonids than a dock that merely attracts existing boat traffic. The former would have a greater effect than the latter, but they would be of the same essential type: increasing boat traffic in a particular area near shore and thus interfering in juvenile salmonid migration and rearing.

However, at oral argument the Corps argued that this court's analysis of the cumulative impact analysis look to the record as a whole, including the EA, the BiOp, and the studies in the record that conclude that man-made structures on the Willamette do not have a significant impact on salmonid survival. (USACE A.R. 63-80, 12-57; NMFS A.R. 80, 112.) The BiOp contains an

extensive analysis of the environmental baseline of the Lower Willamette, (BiOp 14-21), and examines the effects of the proposed dock project on the river and the listed salmonid population (*id.* at 21-27). The scientific evidence in the record supports the BiOp and EA's conclusions that the dock will not have a substantial negative impact on salmonid in the Willamette. (NMFS A.R. 80 at 9, 117 (study "found little evidence to suggest that nearshore habitat as it currently exists is a critical factor affecting yearling salmonids"); *id.* 112 at 1 ("waterway developments presented few risks to migrating juvenile salmonids").)

Considering the record as a whole, the scope of the cumulative impact analysis satisfies NEPA. The Corps examined and adopted the BiOp's detailed analysis of the environmental baseline, which includes the effects of docks and other similar structures along the shores of the Willamette. The agency then examined in more detail the effect of seven transient docks similar to the proposed project and the likelihood that such projects will be built in the future. (USACE A.R. 77.) Considering this analysis and the scientific evidence in the record, the Corps' determination that the cumulative effects of transient boat dock construction are minimal is not arbitrary and capricious.

## 2.    Reliance on NMFS's BiOp

NEDC contends that the Corps' reliance on NMFS's BiOp caused its cumulative impacts analysis to be arbitrary and capricious and that the Corps' EA falls short of the "quantified or detailed information" that is necessary for a cumulative impact analysis. *BARK v. U.S. Bureau of Land Mgmt.*, 2009 WL 279087, at *5 (D. Or. Feb. 5, 2009) (citations omitted). First, NEDC argues that the BiOp itself is flawed. As I have already determined that the BiOp was proper under Claims 1, 2, 3, 4, and 6, this argument needs no further analysis.

Second, NEDC contends that the BiOp is not a NEPA document, therefore the Corps may not tier to it as a substitute for the Corps' own analysis. *See League of Wilderness Defenders*, 549 F.3d at 1219 (holding that an agency may only tier to documents subject to NEPA review and citing cases) (citations omitted). It was proper for the Corps to rely on the BiOp because NMFS is the expert agency with regard to the effects of federal actions on listed salmonids. Although "NEPA and the ESA involve different standards . . . this does not require [the Corps] to disregard the findings made by [NMFS] in connection with formal consultation mandated by the ESA." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006) (citing 40 C.F.R. §§ 1502.21, 1502.24). In fact, NEPA provides for incorporation by reference as long as the incorporated material is "reasonably available for inspection" and its content is briefly described. 40 C.F.R. § 1502.21. The BiOp is described briefly, incorporated by reference, and attached to the permit. (USACE A.R. 3-4, 71, 74, 79.) This is sufficient under NEPA.

Third, NEDC argues that the BiOp's cumulative impacts analysis is guided by the ESA rather than NEPA and the statutes require different analyses. *See Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1509 (D. Or. 1992) (rejecting an agency's request that the court "accept that its consultation with the United States Fish and Wildlife Service under the Endangered Species Act constitutes a substitute for compliance with NEPA"). The ESA requires NMFS to consider only future non-federal activities that are reasonably certain to occur within the action area, 50 C.F.R. § 402.02 (defining cumulative effects under the ESA), whereas NEPA requires the Corps to consider all past, present, and foreseeable future actions, regardless of who performs the action, that combine with the proposed action to cause an incremental environmental impact, 40 C.F.R. § 1508.7. Furthermore, a finding of "no jeopardy" under the

PAGE 41 - OPINION

ESA indicates that an activity will not jeopardize the continued existence of an entire species, however, a FONSI "must be based on a review of the potential for significant impact[s], including impact[s] short of extinction." *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001). "Clearly, there can be a significant impact on a species even if its existence is not jeopardized." *Id.*

The Corps agrees that the scope of cumulative impact analyses under the ESA and NEPA are different, but points out the only substantive difference is that under the ESA an agency is not required to consider future federal actions, which are considered under NEPA. *Compare* 40 C.F.R. § 1508.7 *with* 50 C.F.R. § 402.02. The action area for this project is small, (BiOp 5), and aside from the project at issue, there is no evidence of any other proposed or reasonably foreseeable federal action likely to occur within the action area that would contribute to cumulative effects on the listed salmonids (USACE A.R. 348; NMFS A.R. 16 at 36). In the absence of reasonably foreseeable federal actions in the action area, the difference between the scope of ESA and NEPA cumulative impacts analysis is largely immaterial. Furthermore, the Corps did consider the possibility of similar transient docks being constructed in the future outside the action area and determined that the cumulative impact would not be significant. (USACE A.R. 77.) The Corps determined, considering the cumulative impacts discussed in the BiOp and in the EA, not only that there was "no jeopardy" to list salmonids, but that "the cumulative effects of transient boat dock construction are . . . minimal." (*Id.*) Thus, the agency did not merely repeat the BiOp's no jeopardy finding, but instead used the BiOp's analysis as support for its separate NEPA finding of minimal cumulative impacts. This is sufficient under NEPA, therefore, the Corps' actions were not arbitrary and capricious.

PAGE 42 - OPINION

### 3.    Future Impacts: Induced Growth in Boating

NEDC contends that the EA's cumulative impacts analysis is flawed because it fails to account for the inevitable induced increase in boating that this and future docks will create.[9]  An action's cumulative impacts include "indirect effects," which include "growth inducing effects." 40 C.F.R. § 1508.8(b).  The Corps concluded that "[t]he dock is not intended to increase river use but is designed to accommodate existing non-trailerable boat traffic."  (USACE A.R. 77.)  The Corps further found that "[t]he individual impacts from future construction are not expected to be significant as the facilities are not intended to increase usage but to attract current users to a variety of different recreational opportunities."  (*Id.*)

NEDC states that this analysis is flawed for three reasons.  First, the intended purpose of the dock is not a proper substitute for the actual effect of the dock.  Second, the EA is internally contradictory by acknowledging elsewhere that the dock will result in more boat traffic.  (*Id.* at 73, 75-76.)  Third, the Corps' assumption has no support in the EA.  Deference cannot compensate for a lack of evidence or analysis.  *Ocean Advocates*, 402 F.3d at 864 (stating that an agency may not rely on "conclusory assertions that an activity will have only an insignificant impact on the environment").

The Corps' determination that the dock will not increase boat traffic is reasonable.  The record demonstrates that building docks does not necessarily increase boat traffic.  Since 2000, the Corps has issued 142 permits for construction on the Willamette, including boat docks of all kinds.  (BiOp 18.)  Between 2000 and 2006, the population of Clackamas County grew by 10.6 percent.  (*Id.* at 27.)  Nevertheless, during the same period, boat registrations declined in

_____

[9] This argument is also directed at NMFS's BiOp in Claim 2.

Clackamas County and throughout the state.  (NMFS A.R. 103 at 8.)  Furthermore, 97.5 percent

of registered boats in Oregon are twenty-six feet in length or less (the dock is designed for boats

twenty-six feet or greater).  (NMFS A.R. 103 at 19; USACE A.R. 64.)  The EA acknowledges

that the dock will increase localized boat traffic around the dock, but this is a different concern

than an increased number of boats in the river as a whole.  Thus, the EA is not contradictory.

The record demonstrates that one dock, designed for a very small percentage of the boat market,

will not increase total boat traffic.  Therefore, the Corps' conclusion is not arbitrary and

capricious.

### D.    *Other Significance Factors*

NEDC ends its arguments regarding Claim 7 giving a wide variety of new reasons that

the EA is improper in a single paragraph.  First, the EA inadequately considered the unique

characteristics of Tryon Creek State Park.  *See* 40 C.F.R. § 1508.27(b)(3) (defining "intensity"

under NEPA to include a consideration of unique characteristics of the geographic area).

Second, the EA may require mitigation in the construction of future docks, which would

establish precedent for future actions, another element of intensity under NEPA.  *See id.* §

1508.27(b)(6).  Third, the EA fails to adequately consider the "highly uncertain" impact on

threatened salmonids due to its reliance on the flawed BiOp.  *See id.* § 1508.27(b)(5), (9).

Fourth, based on the public comments from scientists and other individuals and groups, the

dock's impacts are highly controversial and the controversies are not adequately resolved by the

EA.  *See id* § 1508.27(b)(4).

I will address these issues in a similarly brief manner.  First, the consideration of Tryon

Creek is discussed as to Claim 4, with NMFS's consideration of the critical habitat.  Since the

PAGE 44 - OPINION

Corps incorporated the BiOp by reference, the consideration of the PCEs in the critical habitat was incorporated.  NEDC does not indicate how else Tryon Creek should have been considered.  The Corps also responded to public comments about Tryon Creek, making it clear that it had in fact considered the impact of the dock on the Creek.  (USACE A.R. 66.)  Second, the EA does not appear to require mitigation in the construction of future docks, but rather assumes that the ESA and NEPA will require such mitigation, if future docks are constructed.  Such an assumption is not arbitrary and capricious.  Third, the BiOp's consideration of the impact on the salmonids was not flawed, thus the Corps could properly rely on that analysis.  There is no evidence that the impact of the dock on the salmonids is "highly uncertain."  In fact, as discussed regarding Claim 4, two scientific studies in the record indicate that the construction of docks in the Willamette does not harm juvenile salmonids.  (NMFS A.R. 80 at 9, 117; *id.* 112 at 1, 8-9.)  Fourth, "[t]he term 'controversial' refers 'to cases where a substantial dispute exists as to the size, nature, or effect of the *major* federal action rather than to the existence of opposition to a use.'"  *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982) (quoting *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973)) (emphasis added).  In *Wild Sheep*, several state agencies expressed strong disagreement with the EA's conclusions, as did other conservationists, biologists, and knowledgeable individuals, thus the court determined that the agency should have prepared an EIS.  Here, comments were received from NEDC, the Tryon Creek Watershed Council, and several individuals, however NEDC has not pointed to any comments by biologists or expert state agencies arguing the BiOp and EA were based on bad scientific evidence.  (USACE A.R. 65-69); *see also Rucker*, 484 F.2d at 162 (finding it significant that no federal, state, or local agency charged with expertise in the relevant area

PAGE 45 - OPINION

expressed any objection when considering whether an action was controversial under NEPA).  I

therefore conclude that the Corps properly considered the relevant significance factors under

NEPA.

**CONCLUSION**

Based on the foregoing, NEDC's Motion for Summary Judgment (#17) is DENIED and

NMFS and the Corps' Cross Motion for Summary Judgment (#23) is GRANTED.

Dated this  11th  day of August, 2009.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge